

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P. O. Box 19848**
**Washington, D.C.  20036**

Carolyn E. Williams,
Complainant,

v.

Samuel W. Bodman,
Secretary,
Department of Energy,
Agency.

Request No. 0520060694[1]

Appeal No. 01a60100

Hearing No. 100a27834x

Agency No. 0167HQEIA

<u>DENIAL</u>

Both complainant and the agency timely requested reconsideration of the decision in *Carolyn E. Williams v. Department of Energy*, EEOC Appeal No. 01a60100 (April 5, 2006).  EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that:  (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency.  *See* 29 C.F.R. § 1614.405(b).

Complainant filed two complaints of discrimination, which alleged discrimination on the bases of race (African-American), sex (female), age (55) and in reprisal for prior EEO activity when:

1)  while she was on detail, she performed the duties of a GS-11, but was paid at the GS-9 grade level;

2)  she received a lower performance appraisal than she deserved;

---

[1] Due to a new data system, your case has been re-designated with the above referenced appeal number.

07 0901

**FILED**

MAY 1 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2                                              0520060694

3) she was threatened by her second-level supervisor (S2) when he stated that her federal career would be affected by her EEO activity;

4) she was threatened and verbally intimidated at meetings with her supervisor (S1) (Black, female, prior EEO activity unknown);

5) she received unnecessary and arbitrary assignments so that she would fail to meet her performance deadlines;

6) management exhibited a harassing behavior toward her such that she was forced to leave the building and was placed on involuntary leave for six months;

7) she was placed on a performance improvement plan, denied training and made to sit in an open area;

8) management changed her assigned telephone number and voice mail;

9) management disconnected her computer;

10) management downgraded her security clearance;

11) management informed her that she was occupying a temporary position and that she would be performing different job duties;

12) management packed 12 boxes of her office items and placed them in an open area; and

13) management made harassing and intimidating statements to her and allowed her insufficient time to read a 16-page document.

After a hearing, the AJ issued a decision finding that complainant was retaliated against when, on one occasion, her supervisor told her that "the complaints would be dismissed, and if she wanted to get ahead, doing this would only make it worse for her." The agency thereafter issued a decision implementing the AJ's decision, and complainant appealed. Just prior to her appeal of the agency's final decision, complainant petitioned the AJ for attorney's fees.

On October 5, 2005, the AJ issued an Order denying complainant's request for attorney's fees because she was not a prevailing party. On October 17, 2005, the agency issued a final decision affirming the AJ's decision as to attorney's fees. Complainant did not appeal this decision.

In our prior decision on the merits, we found substantial evidence in the record to support the AJ's decision, and ordered the agency to consider discipline, provide training, and post a notice. Our decision also contained a paragraph advising the parties as to the procedures for awarding attorney's fees.

In her Request, complainant states that the AJ failed to conduct proper discovery. In its own Cross-Request, the agency contends that our order advising complainant as to her attorney fee rights was not correct because, in a subsequent decision, the AJ found complainant was not a prevailing party, and not entitled to attorney's fees. *See Agency's Brief on Reconsideration*, at p. 2.

After reconsidering the previous decision and the entire record, the Commission finds that the requests fail to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the

3                                                0520060694

Commission to deny the requests. Neither party presented sufficient evidence that the prior decision or its order involved a clearly erroneous interpretation of material law or fact. With respect to complainant, the discovery requests she raised in her Request are largely based on irrelevant information. Accordingly, we find the AJ's discovery rulings were not in error.

As for the agency's argument on attorney's fees, we find no evidence that complainant is currently arguing an entitlement to attorney's fees. The record shows that in a decision dated October 5, 2005, the AJ found complainant was not a prevailing party and not entitled to attorney's fees. Complainant was provided with an agency final decision on October 17, 2005, and a right to appeal this decision, but she did not. Furthermore, we noted in our prior decision that complainant did not dispute the remedial award made by the AJ. In light of complainant's failure to appeal the attorney's fee decision, as well as her failure to raise the issue on appeal, we find the matter denying attorney's fees has been adjudicated and is final. The paragraph discussing attorney's fees in our prior decision is not operative given the AJ's decision on attorney's fees, which was not contained in the record at the time the Commission's previous decision was made, and it will not be included herein.

Accordingly, we find complainant and the agency failed to establish the requirements for reconsideration. The decision in EEOC Appeal No. 01A60100 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

<u>ORDER</u> (C0900)

The agency is ordered to take the following remedial action within thirty (30) calendar days from the date this decision becomes final:

1. The agency shall consider taking appropriate disciplinary action against S2. The Commission does not consider training to be disciplinary action. The agency shall report its decision to the compliance officer. If the agency decides to take disciplinary action, it shall identify the action taken. If the agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline. If S2 has left the agency's employ, the agency shall furnish documentation of his departure date.

2. The agency shall require S2 to undergo 8 hours of training in the requirements of Title VII, with emphasis on the prohibition against retaliation; and

3. The agency shall post a notice of discrimination as set forth below.

The agency is further directed to submit a report of compliance, as provided in the statement entitled "Implementation of the Commission's Decision." The report shall include supporting documentation verifying that the corrective action has been implemented.

4                                                    0520060694

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. *See* 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. *See* 29 C.F.R. § 1614.409.

## POSTING ORDER (G0900)

The agency is ordered to post at its Washington D.C. facility copies of the attached notice. Copies of the notice, after being signed by the agency's duly authorized representative, shall be posted by the agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer at the address cited in the paragraph entitled "Implementation of the Commission's Decision," within ten (10) calendar days of the expiration of the posting period.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

5                                    0520060694

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:


_Carlton M. Hadden_
Carlton M. Hadden, Director
Office of Federal Operations


FEB 0 8 2007
Date



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Washington, D.C.  20507

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
An Agency of the United States Government

This Notice is posted pursuant to an Order by the United States Equal Employment Opportunity Commission dated _____ which found that a violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.* has occurred at this facility.

Federal law requires that there be no discrimination against any employee or applicant for employment because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, or PHYSICAL OR MENTAL DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment.

The Department of Energy, Washington, D.C. facility (hereinafter referred to as "facility"), supports and will comply with such Federal law and will not take action against individuals because they have exercised their rights under law.

This facility engaged in retaliation  when complainant's second-level supervisor told complainant that her [EEO] complaints would be dismissed, and if she wanted to get ahead, doing this would only make it worse for her."

The facility was ordered to provide EEO training to and consider disciplinary action against the responsible management official.  The agency was also ordered to post this notice.

The facility will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, federal equal employment opportunity law.

Date Posted: _____     _____

Posting Expires: _____
29 C.F.R. Part 1614

6                                    0520060694

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Carolyn E. Williams
8931 Town Ctr Cir
#308
Largo, MD  20774

Poli Marmolejos, Director
Office of Civil Rights
Department of Energy
1000 Independence Ave., SW  4B-112 Forr
Washington, DC  20585

Matthew Fogg
P.O.B. 30956
Washington, D.C. 20030-0956

FEB 0 8 2007
_____
Date

_____
Equal Opportunity Assistant

GARY HOWARD SIMPSON

*Attorney at Law*

9505 KINGSLEY AVENUE
BETHESDA, MARYLAND 20814

PHONE 301-493-0345
FAX 301-493-0347
INTERNET: ghslaw@bellatlantic.net

GARY H. SIMPSON (MD, DC)
ALANE TEMPCHIN (MD, DC)

OF COUNSEL
KRAUTHAMER & STAHL, CHTD.

October 3, 2001

Mary J. Hutzler
Acting Administrator
Energy Information Administration
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Re: Carolyn E. Williams: Notice of Proposed Enforced Sick Leave

Dear Ms. Hutzler:

On April 26, 2001, the U.S. Department of Energy (via Stephen Durbin) notified my client, Carolyn E. Williams, that the Agency was proposing to place Ms. Williams on enforced sick leave for an indefinite period of time. The grounds for doing so were that Ms. Williams had been "unreasonably unresponsive to attempts by Ms. Barbara Hall, [her] immediate supervisor, and me to have discussions with [Ms. Williams] to address [her] performance deficiencies." Then, Mr. Durbin asserts that because Ms. Williams raised a "medical condition" as the reason for her unresponsive behavior, placing her on enforced sick leave is appropriate response to this problem.

These charges are without merit, and Mr. Durbin has drafted these allegations as means to retaliate against Ms. Williams for filing equal employment opportunity complaints against him and for her efforts to seek union representation. Mr. Durbin's

*hand delivered*
*10/4/01*

rationale for placing Ms. Williams on sick leave is a mere pretext for his true motivation for taking this adverse action against my client based on her protected EEO and labor activities. The intent behind these actions is discrimination based on her age, race, disability, sex, and reprisal. Mr. Durbin fails to produce any legitimate medical evidence that Ms. Williams is not able to perform her job. Nor has there been any dialogue concerning a proposed reasonable accommodation, if he believes that Ms. Williams is disabled. It is clear that this action is part and parcel of Mr. Durbin's on-going efforts to harass and intimidate Ms. Williams, and the proposal must be rescinded.

Ms. Williams can rebut each of the charges alleged in the April 26, 2001 letter, and she can demonstrate that she is fit to return to work with or without an accommodation.

**A. Ms. Williams' Performance.**

First, Ms. Williams' takes exception to the statement that her work as the lead in training in the Energy Information Administration is deficient. This assessment is based on arbitrary and retaliatory actions of Mr. Stephen Durbin and Ms. Barbara Hall. Mr. Durbin's action is tainted by his personal animosity toward Ms. Williams' EEO activity, union activity and because she has notified DOE Security of work force harassment and violence in the Office of Resource Management (ORM).

Ms. Williams is the lead in EIA training. She serves as a Training Program Specialist, which involves interaction with all EIA employees and which encompasses all aspects of training. She did the training for ORM and NEIC which included registering the federal and contractor employees in the CHRIS system . She works independently

with very little interaction with Mr. Durbin and Ms. Hall for the daily operation of training.

Ms. Williams has provided back-up support to the ORM staff as directed by Mr. Durbin and Ms. Hall. She performs EIA training work and the contractor back up work also. Ms. Williams is the only person in EIA doing training without contractor back up. Ms. Williams has performed her substantive work, as well as the busy work she was given. If there are critical tasks that are not being performed why was the contractor not told to provide back up so Ms. Williams could attend to whatever task needed to be performed? Mr. Durbin did not allow the contractor, he hired to aid Ms. Williams, to assist her. In contrast, when Danielle Balthasar, held the Training Position Specialist position at a higher grade, such support was available. However, Ms. Williams' worked without back- up support from August to April 26, 2001.

Ms. Williams has also been given a number of arbitrary assignments, which further contributed to the hostile work environment. Mr. Durbin tested Ms. Williams' analytical abilities by ordering her to prepare an analysis of how she performs her work. Mr. Durbin said he would analyze and rate it himself. In February 2001, at a meeting with Ms. Hall, Ms. Williams was given a separate set of standards. This was done to impede Ms. Williams' productivity in the Office of Resource Management and to lower Ms. Williams' performance ratings intentionally.

In addition, as colleagues such as Dorothy Pritchett, Charles Washington, Lenny Conrad, and others, can attest, Ms. Williams is easy going, and she works well with others; she provides the training information that EIA customers requests, and she volunteers information she feels is useful. I have attached statements from Ms. Pritchett

and Mr. Conrad further describing the unjust, harassing, discriminatory and retaliatory treatment Ms. Williams has suffered.

Furthermore, Ms. Williams takes pride in her career. Ms. Williams has taken the lead in EIA training. She organized the training for ORM and NEIC and registered the federal and contractor employees in the CHRIS system. She has provided back up to the ORM staff, and she has attended the Family Friendly Meeting for Mr. Durbin, taken notes and provided him the information when Ms. Hall was on leave. She has completed Ms. Hall's work, a GS-14, which was forwarded to the Civil Rights and Diversity Office. Therefore, there should be no question as to Ms. Williams' competence.

**B. Ms. Williams' Has Provided Adequate Documentation and Justification to Support her Decision Not to Attend Hostile Meetings with Mr. Durbin and Ms. Hall**

Ms. Williams has met with Mr. Durbin and/or Ms. Hall on a number of prior occasions including, but not limited to: February 20, 2000; June 26, 2000; July 25, 2000; July 26, 2000, August 9, 2000; November 2, 2000; November 8, 2000; November 14, 2000; December 5, 2000; February 16, 2001 and March 18, 2001. It is also true that Ms. Williams declined to meet with Mr. Durbin and Ms. Hall on a number of occasions due to illness, including the dates noted in the April 26, 2001 proposal to place her on sick leave. The proposal fails to state that she did meet with her supervisor numerous times and also fails to state that Ms. Williams provided documentation and valid reasons to support her absences. On April 10, 2001, Ms. Williams provided Ms. Hall an original copy of her sick leave slip from her cardiologist, which described her illness. On March 28, 2001, April 18, 2001, and April 19, 2001, Ms. Williams felt ill and went to the Health Unit. I am providing you a copy of Ms. Williams' medical records from the Health Unit.

Moreover, Ms. Williams provided Mr. Durbin a memorandum explaining her refusal to meet with him on April 18, 2001 out concern for her health and safety. (See attached Memorandum).

In addition, the proposal fails to state Ms. Williams' chief concern regarding these meetings – the fact that she had a legitimate fear of being alone with Mr. Durbin and Ms. Hall. The hostile work environment Ms. Williams has been subjected to in ORM began in 2000 and it has continued to affect her health and safety at work. Ms. Williams was summoned to and attended many hostile meetings with Mr. Durbin and Ms. Hall for approximately one year. During meetings Mr. Durbin and Ms. Hall denied Ms. Williams' requests for a representative to attend the meetings with her. The hostile work environment and intimidation at these meetings with Mr. Durbin and Ms. Hall, together and/or one-on-one escalated. Ms. Williams was yelled and screamed at in meetings loud enough to be heard in the hallway. Mr. Durbin threatened her federal career when he said: Ms. Williams' EEO activity would affect federal career. Ms. Hall snatched a federal document from Ms. Williams' hand, while she was writing a sentence under her signature. During a late evening meeting on March 8, 2001, Mr. Durbin lunged at Ms. Williams, and in a hostile, angry tone, he said, "You need to take a good look at yourself in the mirror." After the physically threatening March 8, 2001 meeting Ms. Williams justifiably feared being alone with Mr. Durbin and Ms. Hall. Ms. Williams' fear for her safety rose to such a level that she believed it necessary to lodge a number of reports with DOE Security as a means to protect herself from Mr. Durbin and Ms. Hall. (See attached Incident Reports).

### C. March 28, 2001 and April 10, 2001 Incidents.

Ms. Williams does not recall the exact circumstances regarding the March 28, 2001 and April 10, 2001 meeting requests. (Since being placed on leave, she does not have access to her notes and records she maintained on such incidents). However, there are entries for both of these dates in her DOE medical records. On March 28, 2001, her health records state that she reported that her heart was beating fast and the she was under stress on that day. On April 10, 2001, the health records show that she went to the Health Unit to report that she was taking new medication and she provided a return to work slip from Dr. Boisey Barnes, permitting her to return on April 10, 2001. (See attached medical records.)

### D. April 18, 2001 Incident.

Ms. Williams refused to meet with Mr. Durbin and Ms. Hall on April 18, 2001 for the reasons stated in Ms. Williams Memorandum, dated April 18, 2001. Those reasons are incorporated herein by reference. (See attached memorandum.) This was another situation where she refused to meet with her supervisors based on their past hostile and threatening conduct.

### E. April 19, 2001 Incident

On April 19, 2001, Mr. Durbin in a hostile tone, ordered Ms. Williams not to leave her office unless he told her to do so. Ms. Williams was invited to L'Enfant Plaza to attend the Training Coordinators overview of the new CHRIS training system. Ms. Williams later discovered that Ms. Hall had removed her name as Training Program Specialists for EIA , and replaced Ms. Williams name with hers. (See the attached email describing Ms. Williams justification for not attending the April 19, 2001 meeting)

### F. April 23, 2001 Incident

On April 23, 2001, Mr. Durbin questioned Ms. Williams in a hostile tone, regarding documents that he claimed that he had sent her. Ms. Williams had not seen the documents, but Mr. Durbin continued to insist that he had sent the document to her. Ms. Williams became frightened by his unrelenting harassment. No one at DOE would help her. The past threats to Ms. Williams' federal career, and other work place harassment and violence in addition to being alone with Mr. Durbin and Ms. Hall without a representative, caused Ms. Williams to fear for her health and safety. During this hostile encounter with Mr. Durbin, Ms. Williams felt ill and left for the day. She was diagnosed as having heart spasms; she had not experienced this health problem previously.

### G. April 26, 2001 Incident

On April 26, 2001, Ms. Williams was working at her desk when Mr. Durbin rushed towards her, and ordered her to leave the building, and placed Ms. Williams on enforced sick leave. Ms. Williams had previously submitted a medical slip from her doctor, who stated what she had been treated for, and the cardiologists had released Ms. Williams to return to work on April 10, 2001. This continues to be an extremely traumatic situation for Ms. Williams, considering there was no legitimate basis for her expulsion from DOE.

On May 11, 2001, Ms. Williams' doctor issued her a note saying that she was able to return to work, however he advised her against returning to a stressful situation, such as the hostile environment created by Mr. Durbin and Ms. Hall. (See attached note).

### F. Other Harassment and Retaliation

In addition to the enforced sick leave proposal, Mr. Durbin has taken other harassing and retaliatory adverse actions against Ms. Williams. Around July 2001, Ms. Williams learned that Mr. Durbin had denied Ms. Williams building access. Her Q security clearance is also being downgraded. Neither Mr. Durbin nor Ms. Hall has a Q clearance, and in these critical security times for our country and especially the federal government, a high-level security clearance is an asset for DOE.

Also, when Ms. Williams submitted an application to the National Treasury Employees Union (NTEU) for membership, the request was denied by Mr. Durbin. The NTEU then did a bargaining unit clarification that resulted in reprisals, a few days later Ms. Williams was forced from her job by Mr. Durbin and told she was being placed on enforced sick leave. No one else in the office that has been on sick leave, had surgery, a disease or visited the health unit is subjected to this type treatment. They are afforded a reasonable accommodation.

Other evidence of animus against Ms. Williams by Mr. Durbin is that she was placed on "absent without leave" for a day while she was working on an assignment at DOE's Germantown, Maryland facility, and as a result her salary was docked by 11.5 hours. No one told her of this action and Ms. Williams only learned of this when she saw the reduction on her pay statement. Mr. Durbin down-graded Ms. Williams position as training program specialist for EIA when she was permanently assigned to the position. Also, when she was working in the position, when it had the higher grade, she was not given a temporary promotion.

## H. Ms. Hall's and Mr. Durbin's Past Conduct Must be Considered.

An important factor which must be taken into consideration when assessing the validity of the charges against Ms. Williams, is the credibility and past conduct of Ms. Hall and Mr. Durbin. Andre Fordham of Labor Relations informed Ms. Williams that Ms. Hall was severely reprimanded and sent home to "cool off" for her treatment of subordinate employees. Ms. Hall was away from the office from early August to October 2000. Mr. Durbin has been the subject of a number of employee complaints. In fact, he was removed from his prior position in the Office of Policy as a result of these complaints. (See attached Letter to Secretary O'Leary).

## Argument

Placing Ms. Williams on enforced sick leave is purely punitive in nature and not intended to protect government property, protect governmental interests, protect Ms. Williams, co-workers or the public. See Thomas v. GSA, 756 F.2d 86 (Fed. Cir. 1985); Mercer v. DHHS, 772 F.2d 846 (Fed. Cir. 1985); Pittman v. MSPB, 832 F.2d 598 (Fed. Cir. 1987). Enforced leave is to be applied through adverse action procedures if the leave exceeds 14 days and if it is imposed for reasons of alleged physical or mental disability. Morrison v. Dept of Air Force, 37 MSPR 479 (1988).

Here, Ms. Williams was placed on administrative leave on or about April 26, 2001. However, she has not been given an opportunity to respond to this action until September 10, 2001 in violation to her due process rights. For constitutional due process to be provided to an individual placed on enforced leave, the process must be offered in a

timely manner. <u>Guillory v. Dep't of the Navy</u>, 50 MSPR 244, 250 (1991). Here although

two meetings were initially scheduled to discuss the proposal shortly after its issuance,

these meetings were cancelled and Ms. Williams was told that she had to await the

appointment of a new administrator to oversee this process, which did not occur until

months later.

Aside from the timeliness issue, substantively, the Agency acted inappropriately

by placing Ms. Williams on enforced leave.    Involuntary leave is improper if the

medical conditions alleged do not justify the action and the employee was ready and

willing to work. <u>Morrow v. Dep't of Army</u>, 4 MSPR 443 (1980). Here, there is no

evidence that Ms. Williams suffers from a condition which requires her to be placed on

indefinite enforced sick leave.

The agency's placement of an employee on enforced leave for more than

fourteen days, based on the employee's physical disability, constitutes a suspension

because the absence is involuntary. <u>Pittman v. MSPB</u>, 832 F.2d 598, 599-600 (Fed. Cir.

1997). To sustain a suspension, the agency must prove by preponderant evidence that the

charged conduct occurred, that a nexus exists between the conduct and the service

efficiency, and that the penalty is reasonable. <u>Pope v. U.S. Postal Service</u>, 114 F.3d

1144, 1147 (Fed. Cir. 1997). However, once an agency learns that the employee is fit for

duty, the employee must be restored immediately to active duty status. <u>Mercer v. Dep't</u>

<u>of Health & Human Servs.</u>, 772 F.2d 856, 858 (Fed. Cir. 1985).

Here, at the time the agency imposed the suspension there is no indication that

Mr. Durbin had sufficient medical information about Ms. Williams to determine that she

was not fit for duty. <u>See Barresi v. U.S. Postal Serv.</u>, 65 MSPR 656, 664 (1994) (holding

critical factor in determining whether indefinite suspension may be imposed pending investigation into appellant's conduct is the evidence the deciding official had before him at the time he acted.) The only evidence Mr. Durbin states that he has regarding Ms. Williams' health is that she made "frequent unexplained visits to the Department's Forrestal Health Unit." The April 26, 2001 proposal letter does not specify what conditions Ms. Williams was treated for nor does it contain any medical assessment of her health. At most, Ms. Williams' coincidentally became ill on a number of occasions in which Mr. Durbin sought to meet with her. Nothing in the record establishes that Ms. Williams is unfit for duty. The record however does establish that Ms. Williams has been placed in a hostile work environment and has filed a number of grievances to no avail.

Instead of dealing with Ms. Williams' concerns, the Agency has removed her from the workplace in retaliation for her protected activities. Ms. Williams does not deny that she has suffered a number of health problems. However, none of these health concerns require she be placed on enforced sick leave. If the Agency believes that she is disabled, it is the Agency's duty to propose some reasonable accommodation under the Rehabilitation Act. A full analysis of the Agency's duties under the Rehabilitation Act is set forth below.

## II.    Summary of Section 203 of the Rehabilitation Act and Related Cases

An "individual with a handicap" is one who has a physical or mental impairment which substantially limits one or more of such person's life activities. 29 C.F.R. Sec. 1614.203 (a). Under the Rehabilitation Act, a "mental impairment" is "any psychological disorder or condition." 29 C.F.R. Sec. 1630 2(h) App. This mental or psychological disorder must be shown to substantially limit major life activities. Major life activities

include mental and emotional <u>processes</u> such as <u>thinking</u>, <u>concentrating</u> and interacting with others." <u>Id</u>. "Substantially limits" means it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that activity; this assessment must be made on a case by case basis. <u>Id</u> at 1630. 2 (j). However, for purposes of the Rehabilitation Act, depression <u>is</u> a mental impairment which "substantially limits one or more of life's major activities." <u>Doe v. Reg. 13 Health-Mental Retardation Comm.</u>, 704 F.2d 1402 (5th Cir. 1983) (anxiety, insomnia and depression). A "qualified individual with a handicap" means with respect to employment, an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others...." 29 C.F.R. 1614.203 (a) (6). Not all duties of a position are essential. The fact that the employee cannot perform some duties of the position without accommodation does mean she is "not qualified" under the Rehabilitation Act. <u>In re: U.S. Postal Service</u>, 05870578, 1830/A5 (1988) (holding that employee who could perform 10 of 15 duties was fully capable of performing the essential functions of his position without accommodation). When a nonprobationary employee becomes unable to perform the essential functions of his or her position <u>even</u> <u>with</u> reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position located in the same commuting area ... the essential functions of which the individual would be able to perform, even with accommodation, if necessary unless the agency can demonstrate that

the reassignment would impose undue hardship...." 29 C.F.R. 1614.203 (g) (emphasis added).

A.  **If the Agency alleges Ms. Williams is "A Person with a Handicap" Agency Has Affirmative Duties toward Employee**

Once there is a determination that an employee is handicapped the Agency has an "affirmative obligation" to accommodate that person. Here, DOE has made no effort whatsoever to accommodate Ms. Williams' perceived disability.

III.  **Agency's Burden of Production**

A.  The High Standard for Federal Employers

Federal employers are held to an even higher standard of reasonable accommodation than are private employers. Section 501 of the Act, 29 U.S.C. 701, requires federal agencies to act affirmatively to "structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." Prewitt v. United States Postal Service, 662 F.2d 292, 306 (5th Cir. 1981) (quoting Ryan v. Federal Deposit Ins. Corp., 184 U.S. App. D.C. 187, 464 F.2d 762, 763 (D.C. Cir. 1977)); Buckingham, 998 F.2d at 739.

The duty on federal employers thus goes beyond mere nondiscrimination. Regulations promulgated under Section 501 require such a federal agency to be a "model employer of handicapped individuals [individuals with handicaps]," 29 C.F.R. 1614.203( b), and emphasize the affirmative obligation to accommodate. An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee [qualified individual with handicaps] unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program. 29 C.F.R. Sec. 1614.203(c).

The "affirmative action" language in Sec. 501 means, as it implies, that Sec. 501 imposes a duty beyond evenhanded treatment. Section 501 requires that federal agencies make a more active and affirmative effort to eliminate barriers to employment of the handicapped than mere nondiscrimination. Mantolete, 767 F.2d at 1422; Meisser v. Hove, 7 A.D.D. 434, 452 (D.C.N.D.Ill. 1994).

Rather than honoring the "affirmative action" requirements placed upon it by law, DOE is threatening to indefinitely suspend Ms. Williams without the slightest hint into or suggestion regarding any form of reasonable accommodation. This is the rough equivalent to the Greeks of antiquity leaving infants on the side of a mountain to die so that preferred newborns could prosper.

**B. Regulatory Guidelines for Reasonable Accommodation**

The regulations "give a prominent role to the task of accommodation." McWright v. Alexander, 982 F.2d 222, 226 (7th Cir. 1992). Indeed, the regulations specify a sampling of types of accommodation that may be required:

> Reasonable accommodation may include, but shall not be limited to: . . . job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions. 29 C.F.R. Sec. 1614.203(c)(2).

The U.S. Office of Personnel Management ("OPM") defines the term "reasonable accommodation" in its Handbook of Reasonable Accommodation (OPM Handbook) as "a logical adjustment made to a job and/or the work environment that enables a qualified handicapped person to perform the duties of that position." Meisser, 7 A.D.D. at 454. The OPM Handbook illustrates clearly the employer's affirmative obligation to make an individualized inquiry into a disabled employee's known abilities and limitations and

gather information sufficient to identify ways in which to tailor that individual's capability with reasonable accommodations.

> The types of accommodations which can be made are numerous and may include: work site modifications; adjusting work schedules; restructuring jobs; . . . ; and reassigning or retraining employees. When planning accommodations it is important to remember that accommodations are highly individualized and what may have been successful for one disabled person may not be appropriate or necessary for another. This holds true for individuals with the same or similar disabilities. In each case the need for an accommodation and the functional problems precipitating this need must be clearly identified and understood before appropriate planning of accommodations can take place. This involves analysis of the known abilities and limitations of a disabled individual with respect to the functional requirements of a particular job and the nature of the work environment in which the job is performed. A job analysis is crucial and makes this possible. Id.

Since the elements of the prima facie burden have been met successfully, the burden of production shifts to the agency to introduce evidence either that it has reasonably accommodated the employee's needs or that further accommodation would create an undue hardship. Gallagher, 778 F. Supp. at 577-78.

### C.    Meaningful Fact Gathering -- No Speculation

To meet its burden under the Rehabilitation Act:

> An employer . . . may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to "gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are necessary to enable the application [applicant] to perform the job. . . ."

Buckingham, 998 F.2d at 740 (quoting Mantolete, 767 F.2d at 1423); Meisser v. Hove, 7 A.D.D. 434, 460 (1994). In Ms. Williams' case all the agency does is to simply speculate that she could not perform his duties. Certainly it did not engage in a particularized information gathering exercise as the law requires.

## D. Individualized Job Assessment

The agency must make an "individualized assessment of an employee's impairment and qualifications and of possible accommodations . . ." prior to deciding that an accommodation would impose an undue burden. <u>Smith v. Secretary of Army</u>, 03910110, 3326/G1 (1992). "Such an evaluation necessarily required the gathering of substantial information by the employee . . . (since it was the intent of Congress to prevent employers from refusing to give much needed opportunities to handicapped individuals on the basis of misinformed stereotypes.") <u>Id</u>., quoting <u>Mantolete</u>, 767 F.2d at 1422. In Ms. Williams' case, the agency should have conducted an analysis of Ms. Williams' performance in all aspects of her employment. Obviously, the agency failed and refused to perform this type of analysis specifically for Ms. Williams.

In light of the above-mentioned federal statutes, regulations and guidelines, it follows that DOE may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to "gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are necessary to enable the applicant to perform the job ...." <u>Mantolete</u>, 767 F.2d at 1423.

The agency did nothing in terms of these duties. Nothing at all.

The federal agency's duty to gather accurate information about a particular job and a disabled employee's ability to perform is not to be considered lightly -- it is essential. The agency is required to conduct research that accurately identifies job functions and the disabilities of the person concerned, and compares the two in order to ascertain appropriate accommodation measures.

"Job Analysis," simply defined, is the process by which information relative to a specific job, position, or occupation is collected, analyzed, and interpreted. With respect to reasonable accommodation, it is the essential process through which accurate and complete information about the functional job requirements of a particular job and the nature of the work environment can be identified. A comparison of information collected through a job analysis process to information on the functional abilities and limitations of a disabled individual provide the basis from which potential problems can be identified, understood, and appropriate accommodations planned. *Id.* (emphasis supplied).

There was no job analysis performed relative to Ms. Williams and her position. However, the "ignorance is bliss" approach to Ms. Williams' legally protected needs does not allow DOE to ultimately escape liability.

The duty to conduct a job analysis of Ms. Williams' position is not a trivial oversight, but rather one which directly leads to liability. The court in Estate of Reynolds v. Dole, 1 AD Cases 1628, 57 BNA FEP Cases 1848, aff'd, 985 F.2d 470 (9th Cir. 1993) found that a federal employer failed to provide reasonable accommodation to an individual with epilepsy where it failed to conduct a job analysis of her position and to assess her ability to meet the essential functions of the position prior to forcing her to choose between an alternative job and termination. Similarly, the failure to conduct a detailed, individualized inquiry into the job and the employee's ability to perform it leads directly to a federal employer's liability. School Bd. of Nassau County v. Arline, 480 U.S. 273 (1987), reh. den. 481 U.S. 1024; Hall v. United States Postal Service, 857 F.2d 1073, 47 BNA FEP Cases 1540 (6th Cir. 1988).

In sum, DOE failed to respect the fact that Ms. Williams' perceived or actual disability merited a comprehensive inquiry into possible accommodations. By failing to research the issue of what could be done to accommodate an employee, who is actually or perceived as handicapped, DOE has conducted itself in direct opposition to "the intent of Congress to prevent employers from refusing to give much needed opportunities to

handicapped individuals on the basis of misinformed stereotypes." <u>Mantolete</u>, 767 F.2d at 1422.

### E.    <u>Duty to "Negotiate and Consider Options"</u>

The law places upon federal agencies the duty of making inquiries concerning possible alternative accommodations and establishing that it could not reasonably accommodate the complainant's asserted disability.  The agency may not use speculation to carry its burden.  The EEOC has issued regulations imposing a duty upon employers. The burden is stated to be the following: "In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position." 56 FR 35748.  The EEOC Technical Assistance Manual states that "An employer should always consult the person with the disability as the first step in considering an accommodation. . . ."  EEOC regulations require, when necessary, an informal, interactive process to find an effective accommodation."  EEOC Technical Assistance Manual, Chapter 3, p. III-9.  DOE willfully refused to follow these legal mandates. **Ms. Williams has continually requested relief of the hostile environment she had been placed in, however  no action was taken. Nor did the Agency ever offer Ms. Williams a meaningful opportunity to negotiate any reasonable accommodation.** It is clearly in violation of the law.

DOE, particularly as a federal agency with the obligation to be a model employer for the disabled, was required to conduct extensive fact finding and evaluate possible accommodations in light of Ms. Williams' actual or perceived disabilities.  This should have involved some dialogue with Ms. Williams and her physicians.  But in fact no

negotiations were held. Additionally, DOE failed to undertake a good faith search on its own to find alternative vacant positions for Ms. Williams', either at or below her grade level.

In this case, the agency had an absolute duty to reasonably accommodate his disability. Estate of Reynolds v. Dole, 1 AD Cases 1628, 57 BNA FEP Cases 1848, aff'd 985 F. 2d 470 (9th Cir. 1993). An agency is not limited to considering only those accommodations specifically requested by the employee. Walsh v. U.S. Postal Service, 01853056, 1601/A2 (1987). "While . . . the Rehabilitation Act does not require an employer to exhaust limitless possibilities for reasonable accommodation, the burden for accommodation nevertheless remains with the agency." Id.

In fact the **federal government agency should suggest** reasonable accommodations and test the employee's performance with them. Adrain v. Alexander, 792 F. Supp 124, 2 AD Cases 179 (D.D.C. 1992); Carter v. Bennett, 840 F. 2d 63, 1 AD Cases 1205 (U.S. App. D.C. 1988). As long as a reasonable accommodation available to the agency could have plausibly enabled Ms. Williams to adequately perform her job, the agency is liable for failing to attempt that accommodation. Estate of Reynolds, supra.

The agency clearly did not use any of its own imagination, creativity or expertise to see if there were accommodations for Ms. Williams which "could work." The agency instead chose to suspend and expel Ms. Williams' from DOE without an adequate medical basis.

F.    **Job Restructuring**

Part of the agency's burden of reasonable accommodation is to explore the possibility of job restructuring for a qualified individual with a disability. 29 C.F.R.

1614.203(c)(2)(ii). Under this regulation the precise efforts of the agency to restructure a particular position will depend on the duties involved and the nature of the disability as well as a number of other factors. Each case must be assessed on an individual basis.

It is clear error when the agency fails to consider job restructuring, or to place a permanently disabled employee in a light duty status for a short period of time prior to terminating him without consideration of job restructuring. Sanders v. U.S. Postal Service, 01811035, 1238/F4 (1984).

As noted above, the OPM Guide provides that job restructuring is a primary way in which an employer can accommodate an employee's disabilities.

> Job restructuring is one of the principal means by which qualified handicapped workers can be accommodated. The idea is to identify factors which make a job incompatible with a worker's handicap and, if possible, eliminate them so that the capabilities of the person may be used to the best advantage. Job restructuring does not alter the essential function of the job. Rather, any changes made are those which enable the disabled person to perform these functions. This sometimes involves changing job content by isolating and eliminating nonessential duties through reassignment. Often, however, job modification is a matter of slightly altering the method of task accomplishment. Id. at 453.

In this case, DOE has been deficient in its duty. It does not appear as though the Agency has even considered job restructuring as a solution. It is clear error when the agency fails to consider job restructuring as noted above in Sanders v. U.S. Postal Service, 01811035, 1238/F4 (1984).

### G.    Transfers As Reasonable Accommodations

The agency totally failed to either consider or give Ms. Williams an opportunity to transfer to another position for which she was qualified outside of the job which she held at the time of her suspension. There is no excuse for this total failure to abide by clear law and regulations regarding transfers as reasonable accommodations. Given the duty the Act and its progeny place on employers, DOE cannot argue that there is a per se

rule against transfers as reasonable accommodations. Courts have approved of or recommended a wide range of strategies for the reasonable accommodation of handicapped employees. See e.g., Fuller v. Frank, 916 F.2d 558, 569 (9th Cir. 1990); Buckingham, 998 F.2d at 740. **Other circuits have explicitly recommended the consideration of transfers to different locations.** See Langon v. Dep't. of Health and Human Services, 295 U.S. App. D.C. 49, 959 F.2d 1053, 1060 (D.C. Cir. 1992) (remanded for consideration of whether employee's handicap could be accommodated by working at home); Arneson, 879 F.2d at 398 (remanded for employer to consider transfer to another office and employment of a part-time assistant to reasonably accommodate employee with a neurological disorder).

Ms. Williams is not asking for the type of job transfer that the Supreme Court has suggested might not be required under the Act. See School Bd. of Nassau County v. Arline, 480 U.S. 273, 289 n. 19, 94 L. Ed. 2d 307, 107 S. Ct. 1123 (1987) ("Although [employers] are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.").

Furthermore, employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job. Qualified handicapped employees who can perform all job functions may require reasonable accommodation to allow them to: (a) enjoy the privileges and benefits of employment equal to those enjoyed by non-handicapped employees or, (b) pursue therapy or treatment for their handicaps. In other words, an employer is obligated not to interfere, either through action or inaction, with a handicapped employee's efforts to pursue a normal life.

See McWright v. Alexander, 982 F.2d 222, 227 (7th Cir. 1992). In some instances, this may require employers to alter existing policies or procedures that they would not change for non-handicapped employees, but "that is the essence of reasonable accommodation." Id., 982 F.2d at 227.

Here, the logical solution to the situation would be to transfer Ms. Williams into a different job and away from Mr. Durbin's and Ms. Hall's supervision. However, it does not appear as though the Agency has made any effort to explore this option.

## IIIV.  DEMONSTRATION OF UNDUE HARDSHIP

The agency has not introduced one shred of evidence that any accommodation suggested placed an undue hardship upon it. There was no analysis of any burden. There was no document disclosing competing considerations. The undue hardship defense is not available to the agency in this case. The regulations clearly impose an obligation on the agency to make reasonable accommodations to the handicapped employee's known physical limitations "unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 29 C.F.R. 1614.203(c).

In particular, the regulations provide:

> In determining . . . whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's workforce; and (3) the nature and the cost of the accommodation. 29 C.F.R. Sec. 1614.203(c)(3).

This burden is not carried by Agency's speculation.

In light of the factors the agency is required to consider under the regulation, it follows that an agency's mere articulation of the ostensible undue hardship is an inadequate showing. The undue hardship burden is a "rigorous one" and it must "prove

convincingly" that such a hardship actually exists.  Swafford v. Tennessee Valley Authority, 01831944, 1179/A1 (1984).

In Swafford, the agency failed to meet its burden even though it had given the appellant extra time to find another position within the agency, since it made no attempt to show that an accommodation could not be provided for in the job he held before termination.  In this case, DOE did not attempt to provide Ms. Williams with accommodation, and is likewise precluded from demonstrating undue burden.

Furthermore, the agency does not carry its burden by demonstrating that accommodation would be inconvenient.  The Commission has held that a mere loss of supervisors of flexibility in making work assignments is not an undue burden where the employee could perform 80-90 percent of the job duties and the agency had accommodated him for a two-year period prior to his termination.  Bridges v. Department of Air Force, 01790826, 1002/C10 (1983).

DOE, like the defendant in Swafford, is precluded from demonstrating the existence of an undue hardship, because it has failed to make a prerequisite showing that an attempt was made to accommodate Ms. Williams' actual or perceived disabilities in the first instance.  Even assuming that DOE attempted to accommodate Ms. Williams' disability, like the defendant in Bridges, it cannot justify undue hardship through mere articulation or speculation that an accommodation would be inconvenient.  There is no evidence from DOE that providing any sort proposed accommodation would be an undue hardship.

**Requested Relief**

Ms. Williams requests make-whole relief to compensate her for the Agency's unjustified actions resulting in the proposal to place her on enforced sick leave and the six-month period she has been on administrative leave. She seeks:

- Return to work at the Department of Energy at the same grade level or higher-grade level, and in a career ladder.

- Transfer to a position in which Mr. Durbin and Ms. Hall will have no supervisory authority over Ms. Williams

- To be promoted temporarily for the time she worked as the Training Program Specialists in the GS-11 position.

- Performance awards and other awards given ORM staff.

- To be treated as other federal employees in ORM are treated, and who are provided reasonable accommodations. ( she has severe recurring headaches resulting from an on-the-job injury; closed head trauma in Defense Programs). As a result of the hostile work environment she has heart palpitations arrhythmia and take medication.

- Representative to attend all meetings that Ms. Williams' has to attend with ORM Management.

- Expunge negative data from Ms. Williams' Official Personnel File and any other adverse action file maintained by DOE; and inform Ms. Williams and counsel when it has been removed.

- Provide training on the college level and other DOE training to compensate for hours she was forced out of her job and denied access to the DOE facility.

- Provide training in a career field, such as contracts.

- Restore 11.50 hours deducted from pay and being placed on AWOL in retaliation for doing the work she was assigned. $160.

- Payment of doctor, hospital, ambulance and emergency room bills. Payment in full for medicine, cardiologist and psychologists bills and cost of police unit.

- Undue hardships, pain and suffering: loss of work experience constant harassment and work force violence, emotional suffering and physical

suffering on a continuous basis for over a year. Includes an estimate of costs from October 3, 2001, to date of agreement and she is returned to work.

- Payment of attorneys' fees and costs.

- Any other relief deemed just and appropriate.

### Conclusion

For the foregoing reasons, the proposed enforced sick leave should not be instituted and Ms. Williams should be permitted to return to work.


Respectfully submitted,

*Gary Simpson*

Gary Howard Simpson
9505 Kingsley Avenue
Bethesda, Maryland  20814
(301) 493-0345

Counsel for  Carolyn Williams


Attachments

cc:  Carolyn Williams

**EMPLOYEE HEALTH RECORD**    Social Security No : 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    DATE 4/15/96

| Mr. Mrs. Miss. (Last Name) | (First) | (Initial) | BIRTHDATE | ☐ MALE |
| Williams, Carolyn | | E. | 11/2/46 | ☑ FEMALE |

EMPLOYING AGENCY: Dept of Energy    BLDG. AND ROOM NO. 1E-127    OFFICE PHONE 202 586-9194

EMPLOYEE'S JOB TITLE: Program Specialist    SUPERVISOR'S NAME Anna Brenderaukew    SUPV. OFFICE EXTENSION 3-4858  Germantown MD

HOME ADDRESS: 1310 Iverson St, T-10  Oxon Hill, MD    HOME PHONE 301 894-1880

PHYSICIAN'S NAME: Dr William Dixon    ADDRESS 5505 5th St. N.W  Wash. D.C.    PHYSICIAN'S OFFICE PHONE (202) 526-5051

**SIGNIFICANT MEDICAL HISTORY**
(Enter date of onset. If unknown, enter check (✓))

**OWCP RECORD**

| accident 4-11-96 | DATE | FORM possible | TYPE OF INJURY |
|---|---|---|---|
| Allergic to Peanuts, 4 types grasses | 04-15-96 | Cat CA16 | Contusion of arm, shoulder when fell against bus window from bon |
| Asthma | | | |
| Blindness | 10-29-96 | Cat | Leg from R lg |
| Cardiac Disease | 11-0-97 | Cat | R foot fell Bthroon floor thrigh |
| Deafness | | | |
| Diabetes | | | |
| Drug Sensitivity to Penicillin | | | |
| Epilepsy | | | |
| Migraine History | | | |
| Stroke | | | |
| Syncope (Frequent) | | | |
| Tuberculosis | | | |
| Ulcer History | | | |
| Other | | | |
| | | | |
| | | | |

OPERATIONS AND/OR SERIOUS INJURIES AND DATES

SIGNIFICANT FINDINGS ON MEDICAL EXAMINATION    DATE

**NAME:** *Williams, Carolyn*

**PHYSICIAN:**

**BEDREST:**

**INJECTION:**

**BLOOD PRESSURE:** DOB 11-02-46

**OTHER(SPECIFY):**

| | | | | | |
|---|---|---|---|---|---|
| 3/6/01 164/84 P Glancy BL | 3/27/01 132/70 P 100 R | 04-18-01 162/90 P Reg ck | 04-18-01 134/84 P 69 reg | 4-19-01 148/96 P 80 | 4-19-0 |
| 4-18-01 126/82 P Reg | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |
| p | P | P | P | P | P |

# HEALTH DATA BOOK

FOR

NAME: _Williams, Carolyn E._

| DATE | TIME | (Cont'd) IMPRESSION |
|------|------|---------------------|
| 4/20/01 | 3:40p | About nurses moving away from client's |
|  |  | S/O door. Unable to ascertain where |
|  |  | ambulance was taking client. Never forefunt |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

U.S. Department of Energy
# HEALTH DATA RECORD

FOR

NAME: Williams, Carolyn

008 11-02-46

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 04-19-01 | 4:00 | Pt. left H.U. @ 4:35 stating "I am sick & tired & sick my boss. [illegible] day & know when I go back to my office my pressure will slip again." |
| 04/26/01 | 3:15 Pm | Paramedics came to H.U. looking for pt. medical staff unaware of emergency call to 911. Mrs. Robinson nurse aide received call as paramedic entered H.U. T. Kennedy and B. Boykins) along with paramedic proceed to 244-057. Also guards was along. upon arrival pt. was on telephone trying to get in touch c PhD. She stated that she did not want to answer any question would like for us to leave the room. |
| addendum 4/26/01 | | Client stated to Rescue Squad members as nurses were exiting client's office at her demand, that she had called the police already and was waiting for the police to arrive. On police arrival paramedics asked police to allow them to handle situation. Client evacuated on stretcher as nurses were asked to leave the scene. Police stern (cont'd) |

(annotations in left margin: Boykins, Kennedy, R.N.)

## U.S. Department of Energy
# HEALTH DATA RECORD

### FOR

NAME: _William Carslyn_

_DOB 11-02-46_

| DATE | TIME | IMPRESSION |
|---|---|---|
| 04-18-01 | coll(d) | Pt left H.U. to miss nurs aux (illeg) |
| 4-19-01 | 15-20 | Presents c c/o numbness to hands bilat. Also mild chest pain. Pt says she was fine until her supervisor told her she had to stay in her office this morning. Pt says she feels "VERY STRESSED". Pt is on bedrest. VSS. Will reassess in 45 min. Pt is to have a stress test by PMD as per pt. ———— J. Fort RN |
| 4-19-01 | addendum | Pt told me she only took 25 mg Toprol x 2 when she should have taken 50 mg. Pt indicated she is trying to eliminate med. Advised her to call PMD. J. Fort |
| | 4:10 p | Pt states, "My chest feels better. The pain isn't like the other. I feel. I am glad I saw my doctor. My arm feels better (not really) My (R) hand still hurts a little." |
| | 4:30 | BP 126/82  (L)  P 88 reg  Pt states, "My (R) hand is a little better. I'm going to try to get over to my doctor & have her do stress today if not — then tomorrow." |

U.S. Department of Energy
# HEALTH DATA RECORD

FOR

NAME: _William Cawby_

DOB 11-02-46

| DATE | TIME | IMPRESSION |
|---|---|---|
| 24-18-01 | 11⁴⁰ᵖ | Dr. Doctor Practices -, "I brought her medicine down to her" - |
| | 12¹⁰ | Per Staff Nurse Chris Kirk, Pt says he O.K. - I took my topro[l] & lie'd rest awhile longer - I will probably call my doctor & go see him ..." |
| | 1³⁰ᵖ | BP 134/84  Ⓟ P 68 reg — Pt replied, "I guess my medicine really works." (Topro/ XL 25m) — Pt "will call my doctor. I will go see him. My work is stressful — if I go back I will just start not feeling well." Pt A+O+ (signed) |
| | 2ᵖ | Pt left stating "I'm going back to my office & do something & then I will see my doctor." When pt asked, "Do you want to put in my chart that you saw my doctor?" I explained it's not their company was to ensure that she F+O+ pt w/ head palpitations" — |

# HEALTH DATA RECORD

FOR

NAME: _Williams, Carolyn_

DOB   11-02-46

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 4.10.01 | 2³⁰ pm | Emp came to NU c Name of new MEDICATION — TOPROL — taking as needed according to Emp. Also brought a copy of Return to work slip — from Dr Bosey Barre— Diagnosis of PALPITATIONS Emp Requested Copy of old EKG Copy given to Emp.  *Tailor* |
| 04-18-01 | 8⁵⁰ a | N state, " I was at my office & they tell me thing & I get upset My heart starts to palpitate & I need my heart palpitation medicine I placed phone call to office for "someone to bring her palpitation medicine to her" AP 162/70 (L) A A Plareg |
| | 10³⁰ a | Bedrest per request N still resting & waiting for someone to bring her Medication. |
| | 11¹⁵ a | Chw Burley Rutland brought an envelope but not the medication |



RETURN TO WORK OR SCHOOL

BOISEY O. BARNES, M.D., P.C.

2041 M. L. King, Jr. Ave. S.E., Suite 104
Washington, DC 20020
(202) 889-5703

413 G Street S.W.
Washington, DC 20024
(202) 554-2679

This is to certify that

has been under my care for the following:

Date    4/6/01

and is able to return to (work) school on    4 10 07

Remarks:    out since 3/25/0

# HEALTH DAY RECORD

## FOR

NAME: _Williams, Carolyn E._

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 3-6-01 | 3:15p | S: "I've got a headache. I want Bayer's ASA. |
| 3-6-01 | | O: BP 169/84 P96 reg. A: alteration in comfort 2° to headache. P: administer Bayers ASA ii tablet p.o. ZH₂o. Client also requested Bedrest. Allowed Bedrest 30 minutes x 2 consecutive request RTW. ———— Beverly Breykirk |
| 3/28/01 | 2³⁰ pm | S: Pt req. ASA, states she gets her heart is beating fast. Has been under stress today according to Pt. O: BP 132/70 P. 100R denies SOB or chest pain. A: Alteration in comfort 2° to stress. P: Given ASA tab ii per Dr Richards order. Pt stated she was going home now & was going to see her PMD when she could get an appt. ———— Ewenke |

U.S. Department of Energy
## HEALTH DATA RECORD

FOR

NAME: Williams, Carolyn    E ?

DOB 11-2-4

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 11-8-00 | 2 05P | c/o chest pain w/ c/o past heart beating ("stress related") Pt stated (BP 130) P 98, T 98.8° SPO2 97% Meds: ASA, Potassium 1Tab q.d x 2 wks. c̄ PMD — NKMA — Recheck KC Richd. NTG 1/150 gr. SL loc. See PMD [signature] |
| | | ASA x 2 Tab. PO / Bed rest. [illegible] Allow Beprss x 30 mg [signature] |
| 11-08-00 | 2 40P | EKG attached & reviewed by Dr. Richards. Pt refused MD — Dr. Richards orders Nitroglyn 1/150 gr. SL. Took NTG — Pt requested ASA x 2 TABS + bed rest. |
| 11-08-00 | 3 P | Pt states & rest she is feeling better after bed rest + ASA - BP 140/90, P 88 Encourage pt. FU condition c̄ PMD. [signature] |
| 11-9-00 | 11 10 | Rec'd call / Pt's PMD. PMD says pt told him that Digitalis was ordered for pt. I advised PMD that Digitalis was NOT ord |

11-9-00  1110

ordered for pt; that Dr Richards ordered
nitrostat 0.4mg (1/150gr) SL for pt as
per her C/O and EKG. I told the PMD
that she refused; reg ASA and 2 ASA
were given. PMD thinks pt misunder-
stood order for Nitroglycerin and thought
she heard Digitalis. I also made PMD
aware that he would have been
notified immediately if situation called
for it. _____ RN

Discussed c̄ Nursing Staff

## U.S. Department of Energy
# HEALTH DATA RECORD

### FOR

NAME: _Williams, Carolyn E._

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 10/25/00 | 2³⁰/pm | Ⓢ "Could I have some aspirin, my heart feels like it is racing & I usually take aspirin when this happens." Pt states she is very anxious at this time. States that she easily becomes anxious. Reg BR x 30 min. |
| | | Ⓞ BP 138/70 P 96 R. Verbalizing, states nothing unusual caused her to feel this way today. |
| | | Ⓐ Pt in conf. |
| | | Ⓟ ASA tabs ij, BR x 30 min. Advised pt may want to see PMD for possible counseling, exercise suggested. |
| | | ——————————————— |
| | | —— Chron RN |

# HEALTH DATA RE...

## FOR

NAME: _Williams Carolyn_

| DATE | TIME | IMPRESSION |
|------|------|-----------|
| 7/24/00 | 2⁰⁵ | A previous injury on the job – Dr. Richards asked Pt. to return in 30 min – Kennedy |
| 8-31-00 | 3:10p | S: "I've got these insect bites on both of my arms. I got them here at work." "no, I didn't see the bites take place, but I didn't have them until after I got to work today." They itch, really itch. |
| | | O: Ⓡ forearm /raised reddened area approximately 0.5cm x 0.3cm. Ⓛ forearm / reddened area approx size of pin head. |
| | | A: alteration in integument of unknown origin. |
| | | P: Apply Rhuli anti-itch gel to both sites - administer Benadryl 25 mg ↑ cap P.O. Pt teaching providing regarding medications. Client advised she can purchase these items OTC for further tx at the drugstore. Client RTW. |

_Beverly Boykin_

c:\wp5 l\wpdata\nursnote.wpd

**U.S. Department of Energy**
# HEALTH DATA RECORD
### FOR

NAME: _Williams, Carolyn, E_

Ext 6-9194

Chart c̄ Dr. Richard

DOE 11-2-L

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 5/9/00 | 1 P | FU BP 124   P 60,  SPO2 98% |
|  |  | Pt. c̄ HU 80 in stable conditions. Patient |
| 5/10/00 | 1045 | c/o headache - stress related Pt stated |
|  |  | - BP 110/80 ,  P 70 - |
|  |  | Given ASA - Bayer 325mg II PO - |
|  |  | Encourage pt. monitor med effectivness pop up |
|  |  | + FU condition c̄ PMD if not improved |
| 5/12/00 | 5/2/00 | C/o Headache - Migraine ↓ Tab II PO |
|  |  | total TK off          Kennedy |
|  |  | (signature) |
|  |  |  |
| 6-20-00 | 0905 | c/o SOB  B/P-148/94, P.88. Pt says she |
|  |  | is extremely anxious D/T verbal altercation |
|  |  | @ a meeting, Bedrest x 60 min. J. de Porter RN |
| 7-11-00 | 1145 | Pt c/o headache, req med. BP-130/78. |
|  |  | ASA II tabs PO. Pt will monitor need |
|  |  | effect.          J. L Port RN |
| 72100 | 945 Am | c/o headache Working @ computer |
|  |  | 138/70  64 Reg - |
|  |  | ASA gr X           Taylor |
| 7/25/00 | 155 | C/o Headache  BP.140/70  P.88. |
|  |  | ASA gr X PO. |
|  |  | Pt. asked to see Dr. Richards regarding our |

HEALTH DATA RECORD

FOR

NAME: _Williams Caralyn_

| DATE | TIME | IMPRESSION |
|------|------|------------|
| 10-25-99 | 11:30 | |
| 1-6-99 | 10:25 | _Flu Symp. Echinacea Tab i._ |
| | | _Humibid Tab i. Excedrin Tab ii and_ |
| | | _Zinc Lozenges._ _Kennedy Rn_ |
| | | |
| 2/28/00 | | 53 y/o F who was carrying a heavy |
| | | box of papers yesterday when |
| | | she twisted her foot now experiencing |
| | | pain c ambulation in flat shoes |
| | | No other complaint |
| | | |
| | | Amb Alert Orient. NAD |
| | | R Foot nontender to palpation |
| | | Good Capillary Refill |
| | | Sensation intact |
| | | Subject gan on standing flat footed |
| | | But able to walk c 3" heel c comfort |
| | | |
| | | Sprained R Foot. |
| | | |
| | | 1 Advised to keep foot elevated, ICE |
| | | 2 Advil PRN Pain |
| | | 3 IF Discomfort remains to PMD for X-ray |



**RETURN TO WORK OR SCHOOL**

BOISEY O. BARNES, M.D., P.C.

2041 M. L. King Jr. Ave. S.E., Suite 122
Washington, DC 20020
(202) 889-5080

This is to certify that

Ms. Guojun Li Jhang

has been under my care for the following

Dashlama (Asthma)

(week) 4 / 10 / 07

since 3/29/07

Will return to work

Date 4/6/07

202/554-2679

*Boisey O. Barnes, M.D.*
*Diplomate, American Board of Internal Medicine*
*and Cardiovascular Diseases*

*413 G Street, S. W.*
*Washington, D. C. 20024*

5/11/01

To Whom It May Concern:

Re: Carolyn E. Williams
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

I have seen Ms. Carolyn E. Williams on several occasions after she experienced palpitations (heart racing/skipping) while at work. She has related numerous threats and intimidating actions that appear to trigger these recurrent episodes. Because of these recurrent episodes, I recommended that she recuse herself from this apparent hostile environment. I gave her a slip to remain off work until her heart could quiet down. She has not suffered a heart attack or serious consequences at this point. We do want to prevent that from happening. However, for her own good health, avoiding these stressful situations is highly recommended.

Thank you in advance for your understanding.

Sincerely

Boisey O. Barnes

H-07-901 RBW

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS**

Carolyn E. Williams

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **88856**
(EXCEPT IN U.S. PLAINTIFF CASES)

8931 Town Center Circle, Unit 308
Upper Marlboro, MD. 20774

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**DEFENDANTS** Samuel Bodman, Secretary
U.S. Department of Energy,
Stephen F. Durbin & Andre Fordham
COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:07-cv-00901
Assigned To : Walton, Reggie B.
Assign. Date : 5/14/2007
Description: Employ Discrim.

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
   Plaintiff

☐ 3 Federal Question
   (U.S. Government Not a Party)

☒ 2 U.S. Government
   Defendant

☐ 4 Diversity
   (Indicate Citizenship of Parties
   in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

(Place a X in one category, A-N, that best represents your cause of action and **one in a corresponding Nature of Suit**)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
   Administrative Agency is Involved)

☐ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
   defendant
☐ 871 IRS-Third Party 26
   USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
   Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
   Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
   Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
   Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
   Exchange
☐ 875 Customer Challenge 12 USC
   3410
☐ 900 Appeal of fee determination
   under equal access to Justice
☐ 950 Constitutionality of State
   Statutes
☐ 890 Other Statutory Actions (if not
   administrative agency review or
   Privacy Act

(5)

| ☐ **G. Habeas Corpus/ 2255** | ☐ **H. Employment Discrimination** | ☐ **I. FOIA/PRIVACY ACT** | ☐ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ☐ **K. Labor/ERISA (non-employment)** | ☐ **L. Other Civil Rights (non-employment)** | ☐ **M. Contract** | ☐ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7Appeal to District Judge from Mag. Judge

*42 USC 2000 - RACE*

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*Civil Rights Act of 1964 as Amended, And the Civil Rights Act of 1991*

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  **DEMAND $** _____  Check YES only if demanded in complaint  **JURY DEMAND:** ☒ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES ☒ NO  If yes, please complete related case form.

DATE *May 14, 2007*  SIGNATURE OF ATTORNEY OF RECORD *Carolyn E. Williams*    *Carolyn E. Williams*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.


N:\forms\js-44.wpd

FILED

MAY 1 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAROLYN E. WILLIAMS
8931 TOWN CENTER CIRCLE
UNIT 308
UPPER MARLBORO, MD 20774
301-499-2935

  VS.       CIVIL ACTION NO.

SAMUEL BODMAN, SECRETARY OF ENERGY
U.S. DEPRTMENT OF ENERGY
1000 INDEPENDENCE AVENUE, S. W.    JURY REQUESTED
WASHINGTON, D.C. 20585

STEPHEN F. DURBIN
DEPARTMENT OF ENERGY
ENERGY INFORMATION ADMINISTRATION
1000 INDEPENDENCE AVENUE. S. W.
WASHINGTON, D.C. 20585

ANDRE FORDHAM
DEPARTMENT OF ENERGY
1000 INDEPENDENCE AVENUE, S.W.
WASHINGTON, D.C. 20585

Case: 1:07-cv-00901
Assigned To : Walton, Reggie B.
Assign. Date : 5/14/2007
Description: Employ Discrim.

JURY ACTION

*Carolyn E. Williams*
Carolyn E. Williams
8931 Town Center Circle
Unit 308
Upper Marlboro, MD  20774

1

## COMPLAINT

COMES NOW THE Plaintiff, Carolyn E. Williams, and sues the Defendant,

Samuel Bodman, Secretary of the United States Department of Energy (DOE), Stephen

F. Durbin, Director, Office of Resource Management (ORM), Energy Information

Administration (EIA), and Andre Fordham, formerly of the Office of Labor Relations,

DOE and for her cause of action, declares and avers as follows:

## PRELIMINARY STATEMENT

This is an action under the Civil Rights Acts of 1964 as amended in 1992, 42 U.S.C.

Section 2000e-16 *et seq.* and 1991, and as amended for compensatory damages and

equitable relief against Defendant United States Department of Energy, the Equal Pay

Act 20 U.S.C 206 (d), The Rehabilitation Act of 1973 as amended (29 U.S.C. 791), The

Age Discrimination in Employment Act of 1967 (29 U.S.C. 631 and 633a) growing out

of Defendant's discriminary threat to her federal career because of her protected Equal

Employment Opportunity (EEO) activity, denial of a promotion, being placed on a

Performance Improvement Plan, after being ordered out of her job for over six months

and having her building access terminated. Plaintiff's agency identification badge,

indicating her Top Secret Security Clearance was enlarged and placed on the walls of the

U. S. Department of Energy's Security Office in an effort to deny her building entrance.

Plaintiff was barred from reporting to work. Plaintiff's performance was rated for the

entire twelve-month rating period but she was not allowed to work the twelve-month

rating period. Plaintiff was denied training for two consecutive years. On November 14,

2

2000, at 6:00 P. M.  Mr. Durbin threatened Plaintiff's federal career because of the protected EEO activity.   Plaintiff a black American female over the age of 50 was fired from federal service on May 3, 2002.  Plaintiff has been subjected to workforce harassment, harassed because of her sex, intimidated at meetings, suffered threats to her career, and experienced intentional discrimination adversely affecting her career.  The effects of continued harassment and the threats to her federal career made Plaintiff physically ill so as to require the care of cardiologists.

## <u>JURISDICTION</u>

This Court has jurisdiction pursuant to Title VII of the Civil Rights Act 42 U.S.C. Section 2000(e) et seq. "(Title VII") as amended by the Civil Rights Act of 1966, 1972, and 1991 and 28 U.S. C. 1331.  This action is predicated on formal complaints of discrimination timely filed with the Equal Employment Opportunity Office and the Civil Rights Office of the U.S. Department of Energy in the District of Columbia.  Plaintiff's formal EEO complaint was filed on May 15, 2001 by the Plaintiff, as resident of Upper Marlboro, Maryland, while on forced leave as ordered by Defendant Mr. Durbin.  Plaintiff's building access was restricted in retaliation for her protected EEO activity and her reports to the agency's Security Office concerning work place harassment. *See* Reference Report of Investigation Case Number *01(67) HQ/EIA*; filed on May 15, 2001 and Reference Report of Investigation Case Number *02 (31) HQ/EIA* filed on February 1, 2002.  Each of these resulted in negative final agency decisions.   Plaintiff appealed the cases to the Equal Employment Opportunity Commission, herein referred to as the (EEOC).   On April 5, 2006, the EEOC held *Hearing #100a 27834x* held at the Department of Energy. Plaintiff's Hearing date precluded a period of Discovery.  In addition, this action lacked a

3

Pre Hearing letter from the Administrative Judge designating a period of Discovery in Plaintiff's discrimination Hearing. Neither counsel Mr. Richard Semsker nor Plaintiff received any designation of a period of Discovery. This failure put the Plaintiff at a disadvantage. The U. S. Department of Energy, Office of Civil Rights appealed the EEOC Decision subjecting Mr. Durbin to discipline. The appeal was denied by the EEOC and Plaintiff was given the right to Petition the Federal Courts in this case for Title VII violations that were not addressed at the EEOC Hearing. All administrative remedies have been exhausted in Plaintiff's case. Plaintiff received the EEOC decision on February 14, 2007. In the Reconsideration of the Decision in Carolyn E. Williams v. Department of Energy Appeal No 01a60100, the EEOC ordered the U. S. Department of Energy to discipline Mr. Durbin. To date, this order requiring mandatory notice has been ignored at the U.S. Department of Energy.

## VENUE

The unlawful employment practices alleged herein occurred within the District of Columbia where Plaintiff was employed. Plaintiff Carolyn E. Williams is a Black American female, a resident of Upper Marlboro, Maryland, and was employed at the U. S. Department of Energy and an employee within the meaning of Title VII. Plaintiff was employed at the United States Department of Energy from 1985 through May 3, 2002. Plaintiff was injured in 1996, while physically working in the Office of Defense Programs at the DOE Forrestal Building. Her work related injury was diagnosed as a concussion. Plaintiff informed her proposed supervisor Ms. Barbara Hall of her injury on the very day they discussed Plaintiff's detail from the Defense Programs to the Energy Information Administration (EIA) with the DOE Headquarters Building. Plaintiff clearly

4

informed Ms. Hall of the need for reasonable accommodation since the work related concussion left Plaintiff with recurring headaches. Ms. Hall and her supervisor Mr. Durbin approved the Plaintiff's detail the EIA with knowledge of reasonable accommodation required under the Americans with Disabilities Act.

## PARTIES

Plaintiff is a black American married female, a grandmother over the age of 50, and an activist in her church and civic associations. Plaintiff has received yearly sustained performance and "on the spot" specific act awards while employed at the U. S. Department of Energy prior to her reassignment to the EIA   Plaintiff was attending college in the evenings while employed in the EIA. EIA did not financially support Plaintiff's academic studies although others without EEO protected activity received tuition assistance.

Defendant Samuel Bodman is the Secretary of the United States Department of Energy, is responsible for all actions of the United States Department of Energy, and is the employer within the meaning of Title VII.

Defendant Stephen F. Durbin is the Director of the Office of Information Resources Management of the Energy Information Administration.   Mr. Durbin, a GS-15, sought and obtained from DOE Personnel Official, Asa "Bud" Hardison, upon the latter's retirement, a special delegation of personnel management, classification, and staffing authority for himself personally. Mr. Durbin created an "experimental" personnel authority for himself, like that of the DOE Inspector General, which was independent of

5

the DOE Headquarters so as to avoid oversight of prohibited discrimination of disparate treatment of the Plaintiff and disparate impact upon Blacks with prior EEO activity.

Previously around 1993 after numerous EEO complaints against him, Secretary of Energy Hazel O'Leary removed Mr. Durbin from his managerial duties within the Office of Policy at DOE Headquarters. She instructed that he would never again be allowed to be a manager.

Mr. Durbin was reassigned to EIA as a regular GS-15 employee sitting in an office with boxes up to the ceiling. Despite has past poor EEO record, Mr. Durbin again became a supervisor in EIA. Plaintiff is informed and believes that Mr. Durbin had previously worked at the Department of Education and at the Office of Personnel Management based on an online resume that may or may not be accurate.

Defendant Andre Fordham was a GS-13 at the time Plaintiff was fired. He worked in Labor Relations and was the representative for the EIA. Plaintiff believes that Labor Relations should be unbiased and believes that Mr. Fordham was not.

Mr. Fordham was a key player in the firing plan of action for Plaintiff. Plaintiff asserts that Mr. Fordham had an unusual vested interest in her firing when Mr. Fordham was given cash payments from Mr. Durbin for his efforts. Mr. Fordham, a Black American male, was promoted to a GS-14 and now works in another office at the U.S. Department of Energy.

6

Another person of interest is Mr. Rochelle Talley, a Black American male in Labor

Relations, who offered a blank check settlement to Plaintiff's former attorney. The

approving official obligating the U. S. Department of Energy to pay funds was Mr.

Durbin. Plaintiff found that forced settlement unacceptable. Plaintiff believes Mr. Talley

is not longer at the U. S. Department of Energy.

Mr. Durbin hired a contractor named Gordon Rollins, a male Caucasian, using EIA funds

to provide personal legal advice to Mr. Durbin regarding numerous Title VII violations

and EEO cases brought against him by employees he supervised, for damage control.

The plaintiff is informed and believes that the majority of $90,000.00 authorized for Mr.

Rollins was actually paid to him for these personal services regarding pending EEO

actions against Mr. Durbin.

Other parties are now retired: Ms. Barbara J. Hall, Diversity Manager, Team Leader and

promoted to Supervisory Management Analyst; Ms. Mary Hutzler, Acting

Administration, for the Energy Information Administration; Mr. William Dorsey Security

Officer for EIA, and Mr. Lawrence Klure, a legal advisor on EIA payroll.

The four retired parties were major operatives for Defendant Durbin firing Plaintiff and

imposing upon her an ongoing hostile environment including a lack of reassignment and

continued harassment. Ms. Hall is a Black American. Ms. Hutzler is a female Caucasian

and the others are Caucasian males.

## STATEMENT OF THE FACTS

Plaintiff was detailed to the Energy Information Administration in 1999. At this time, Plaintiff's performance rating from rating official Ms. Hall and reviewing official Mr. Durbin was "Outstanding." The losing office Defense Programs changed that rating to Highly Successful.

Plaintiff was reassigned to the Energy Information Administration (EIA) on March 26, 2001. Plaintiff asked Ms. Hall for a copy of her new position description and was refused by Ms. Hall. Since the position description on file was that of a GS-11, the Plaintiff needed to know what was expected of her in the position as the new "Training Program Specialist" in ORM/EIA.

Plaintiff received her Notice of Personnel Action and position description on June 1, 2001, from Ms. Davenia Harris, a student intern. The notice of personnel action stated the position was a GS-9 in the 301 series, with no promotional opportunities, the job was dead-end. Plaintiff had worked in the GS-11 Training Program Specialists position held by Ms. Danielle Turner, a non-black female, in Ms. Turner's office for over 120 days. Plaintiff qualified for the GS-11 in the 301 series, having been a GS-9 in the 301 series since August 1989. This intentional adverse action by Mr. Durbin affected Plaintiff negatively in her federal career. There was never any discussion regarding the position downgrade, or duties of the position with Plaintiff. The work in the position of Training Program Specialist did not change from when Plaintiff was detailed to EIA to the

reassignment date. At no time, did Ms. Hall present Plaintiff with a position description while on detail or as a reassigned employee of EIA. Plaintiff worked as the Training Program Specialist twice, when Ms. Turner was on two separate detail assignments out of EIA.

Plaintiff asserts that Ms. Hall had no input in the job of Training Program Specialist when Plaintiff was on detail, and when she was reassigned to the position permanently. Ms. Turner substantiates Plaintiff's claim in her testimony at the Hearing.

Plaintiff completed some of Ms. Hall duties while on detail, at the GS-14 level. Mr. Durbin told Plaintiff to do the agency-wide Diversity Stand Down training because he knew Ms. Hall could not. Plaintiff sent this report to the Office of Civil Rights and gave Ms. Hall, the Diversity Manager a copy. Plaintiff observed Ms. Hall giving her work to others to complete. This included Ms. Bedney, Mr. Conrad and Ms. Collier. Plaintiff believes Mr. Conrad will confirm that Ms. Hall took credit for his work and that of others. Ms. Bedney and Ms. Collier no longer work at the Department of Energy.

In April 2001, the "Administrative Team," the only all Black team in EIA at that time, was required by Mr. Durbin to complete the dialogue process sheets, or as it is commonly called the "weekly report." The Contracts and Budget Teams also under Mr. Durbin were not required to make these reports. At the weekly meetings Ms. Hall would berate some of the Administrative Team in a Gestapo manner and with hostility. The Team consisted

of Ms. Shaba Bedney (a contractor), Ms. Ruth Wells, Ms. Dorothy Pritchett, Ms. Sharon Maples Lewis, Mr. Joseph Santos, student intern Ms. Gracie Reese, and the Plaintiff.

On July 20, 2000, Ms. Hall yelled and screamed at Plaintiff at a weekly meeting. The decibel of her loud baritone voice was heard outside in the main halls of the Department of Energy. Ms. Hall was heard saying "I don't want no IDP (Individual Development Plan) from no field office!" Mrs. Hall's uncontrolled outburst affected the Plaintiff adversely and undermined her health and well-being.

Originally Ms. Hall had agreed for Plaintiff to prepare the Individual Development Plan (IDP) using the two-paged version she had used in a former office for ten years. Earlier Plaintiff observed Ms. Hall giving a copy of the Individual Development Plan she prepared to Ms. Nancy Nicoletti to Ms. Jeannine Nixon to prepare her Individual Development Plan for training. The two females worked in another EIA Office.

Plaintiff is informed and believes that the creation of an EIA Individual Development Plan was Ms. Hall's work as directed by Mr. Durbin and Ms. Hall passed it on the Plaintiff to complete. Plaintiff learned that Ms. Turner, the GS-11 Training Program Specialist had never before prepared an Individual Development Plan. Plaintiff is informed and believes that the Office of Security knew of the hostile work environment and harassment that Plaintiff was subjected to by Ms. Hall.

In early August 2000, Mr. Durbin and Ms. Hall meet with Plaintiff behind closed doors, in retaliation for reporting Ms. Hall to the Office of Security at DOE Headquarters. They gave the Plaintiff make work assignments to be completed by a certain date. The Plaintiff had not been trained to perform any of this work, but the work was completed on time as ordered.

Around this time Plaintiff learned from Mr. Andre Fordham that Ms. Hall had been sent home to "cool off" from around mid-August 2000, to October 2 or 3, 2000. When Ms. Hall returned from her cooling off period, Plaintiff's work environment became increasingly hostile, intimidating and harassing. Plaintiff continued to prepare the assignment dialogue process sheets as ordered by Mr. Durbin when Ms. Hall was sent home to "cool off." Plaintiff continued to make the reports in e-mail format until the week of April 26, 2001. At this time, Durbin forced Plaintiff out of her job in retaliation for her protected EEO activity.

In October 2001, Ms. Hall informed Plaintiff that she will be rated low for the mid-year reviews, saying Mr. Durbin had ordered her to do this to show that the "Team" was making progress. Plaintiff felt this was unfair and a having a coherent conversation with Ms. Hall had become an impossibility. Mr. Durbin supported Ms. Hall's ongoing hostile environment. Durbin approved Plaintiff's performance plan that was not in place on March 26, 2001.

Plaintiff met with an EEO Counselor to discuss what Ms. Hall had said to her regarding her mid-year rating. Ms. Carolyn Epps of the EEO Office at DOE Headquarters informed plaintiff she could take no action until Ms. Hall had officially rated her low.

On November 14, 2000, at 6:00 P.M., Mr. Durbin threatened Plaintiff's federal career because of her protected EEO activity. There is a witness Ms. Dorothy Pritchett who testified against Mr. Durbin, her supervisor at Plaintiff's EEO Hearing in this regard. The EEOC *Hearing Number 100a27834x* decision was to impose discipline for Mr. Durbin for his Title VII violation of Plaintiff's Civil Rights.

Plaintiff met with Mr. Durbin and Ms. Hall whenever they called her to the later evening meetings behind closed doors. On March 8, 2001, Mr. Durbin lunged at Plaintiff as if he were going to harm her, and said "you need to take a good look at yourself in the mirror!"

Plaintiff reported the incident to Security, from that date forward Plaintiff was fearful for her safety and health in closed-door meetings with Mr. Durbin and Mr. Hall. Plaintiff requested a representative to attend the meetings to hear what they were saying.

Plaintiff was given make-work at this meeting to determine if she needed training. This statement from Mr. Durbin had affected the Plaintiff adversely in her career as the Training Program Specialist, the impact was intentional and disparate as to how Caucasians females and males, and those with no prior EEO activity are treated.

Plaintiff did not observe Caucasian females being summoned to hostile late evening meetings, given make shift work, and make shift work to determine if you needed training, and lunged at, as Mr. Durbin did the Plaintiff.

Mr. Durbin gleefully provided whites with training and the Caucasian females health and safety were never in jeopardy.   Plaintiff completed the make shift work on time, without the benefit of training, other employees without EEO activity were given training to aid them in their work.  The Plaintiff was adversely treated differently by Ms. Hall and Durbin.

If you had protected EEO activity naming Mr. Durbin and Ms. Hall you were treated differently: e.g. denied training, lowered performance rating, no chance of promotion. You were also subjected to work force harassment and removal.  Specifically, Ms. Dorothy Pritchett, Mr. Joseph Santos, and Mr. Leo Conrad, III., were treated differently in the Energy Information Administration because of their prior EEO and other protected activity.   They testified against Mr. Durbin at Plaintiff's EEOC Hearing.

Mr. Durbin fired Mr. Santos, in a reduction in force of one position out of several hundred within EIA, after he would not take a cash bribe from Ms. Hall to prepare a statement against Ms. Pritchett.  There is also the matter of Ms. Hall's sexual harassment of Mr. Santos.  Ms. Hall's supervisory authority was removed and she later retired around September 2006.

Around April 17 or 18, 2001, Plaintiff went to Germantown, Maryland to work in accounts payable with Ms. Laura Copeland, on orders from Mr. Durbin to rectify training carry over funds from prior years. Plaintiff never had access to the EIA training budgets, and did not receive printouts of paid training.

Although she asked for copies, they were only provided to the budget team. Plaintiff had to call Accounts Payable in Germantown, Maryland to determine if a training bill or vendor had been paid. The Budget office of EIA was in the same suite of offices as the Plaintiff was located.

In Accounts Payable in Germantown, Maryland, Plaintiff and a manager, discovered an excess of $60,000.00 in training carry-over funds. This amount does not include travel funds; they are not monitored, at least during that time. Plaintiff believes that this is just the tip of the iceberg of waste fraud and abuse of federal funds by Mr. Stephen F. Durbin. Plaintiff reported the excess to Ms. Hall and put the printout under lock and key. With-in 10 working days Mr. Durbin, placed Plaintiff on forced sick leave on April 26, 2001, as she sat working at her desk. *See Attachment 1, letter to Ms. Hutzler of October 3, 2001.*

After legal negotiations and a Hearing with Ms. Hutzler on October 3, 2001, including a written, and oral response to all questions from Ms. Hutzler, Plaintiff was notified through her former counsel Ms. Tempchin that she could return to work on November 19, 2001. Mr. Andre Fordham attended this meeting.

While on forced leave for six and one-half months, Plaintiff received a letter and a copy of her agency identification badge notifying Plaintiff that her building access had been denied. Ms. Monique Alexander, a Management Resource Specialist who worked for Mr. Durbin, signed the adverse correspondence. Plaintiff's top-secret security clearance was also removed by Mr. Durbin as a prerequisite for being placed in a false light, disparaged, and ultimately fired without cause from her EIA position that required no clearance.

### Mr. Durbin ignores the Acting EIA Administration's Orders

Mr. Durbin failed to adhere to Ms. Hutzler's orders for Plaintiff to return to her job in the same supervisory chain, same duties and same grade. Mr. Durbin had rated Plaintiff below marginal while she was on forced sick leave for six and one-half months and placed Plaintiff on a Performance Improvement Plan (PIP) in December 2001, in retaliation for her protected EEO activity and reports to the Office of Security at DOE Headquarters.

Ms. Tempchin had written to Mr. Durbin while Plaintiff was on forced leave asking if vacancies existed that Plaintiff could apply for and be reassigned to. Mr. Durbin intentionally failed to provide the factual vacancies to Ms. Tempchin. Plaintiff learned of the vacancies when she was allowed to return to work.

### Other Employees Return to the Energy Information Administration

After Plaintiff was allowed to return to work on November 19, 2001, about a week later Ms. Sharon Y. Sutton returned and Ms. Sharon Maples Lewis. Mr. Durbin had hired Ms. Sutton non-competitively in February 2001, without a vacancy announcement and

15

ignoring merit protection principles.   In February 2001, Ms. Sutton worked for about three days and did not return until after November 19, 2001.

Plaintiff has learned that Ms. Sutton had a criminal record for theft.   Moreover, she was convicted in the Upper Marlboro Court, in Upper Marlboro, Maryland for felony possession of cocaine.  Two other felony charges, e.g. intent to distribute fourteen ounces of cocaine, were dropped.

The Plaintiff is informed and believes that Mr. Durbin learned of Ms. Sutton's leave abuse from controlled substances when they were co-workers in the DOE Office of Policy in the early 1990's.   She is further informed that Mr. Durbin needed the Plaintiff's GS-9 position as a training coordinator to be vacated to enable Ms. Sutton's meteoric rise from a GS-6 to a GS-11 over the past several years.

The Plaintiff, who has no substance abuse or arrest record, has been treated disparately in losing her job from the federal service while Ms. Sutton has received five general schedule (GS) grade promotions during which she fell off probation for testing positive for drugs while working at DOE Headquarters under Mr. Durbin.

As her performance reviewing official and second line supervisor, Mr. Durbin gave Ms. Sutton ORM/EIA training responsibilities that were Plaintiff's job as the ORM/EIA Training Program Specialist.   The Plaintiff observed another female Ms. Isabel Ramos a foreign national from San Salvador enjoying employment as a long time as a DOE

contractor under Mr. Durbin without a green card. Ms. Ramos had access to the DOE

training database. Both females had previously worked with Mr. Durbin in the Office of

Policy at Energy.

Ms. Sutton was fired for alleged leave and substance abuse in 1993. Mr. Durbin was

removed from that office for racial profiling and discrimination around the same time.

In Ms. Sutton's Court public papers for 2002 and 2004, she lists her home address as that

of Mr. Durbin's Chevy Chase, Maryland address. Their addresses are also identical in

the CHRIS database at Energy, which contains official personnel and training data. At

the time of Ms. Sutton's probation violation for failing drug tests, the records reflect that

she cohabitated with Mr. Durbin. Since Mr. Durbin has not married Ms. Sutton, the

Plaintiff is informed and believes that his disparate favoritism for Ms. Sutton's career is

not within nepotism violations of Title V of the United States Code.

 Ms. Pritchett who has EEO activity in EIA has provided Ms. Sutton's entire Criminal

*Case Number CT010308B* to the Office of the Executive Secretariat, and the Deputy

Assistant Secretary at Energy, Mr. Jeffrey Clay Cell. The DOE Office of General

Counsel did not allow Ms. Sutton to testify at Plaintiff's Hearing.

At the time of rejoining DOE, the Plaintiff is informed and believes that Ms. Sutton was

age thirty-eight (36) when she received disparate favorable treatment to that of the

Plaintiff.    Unlike Ms. Sutton who was fired for leave abuse in the 1990's, the Plaintiff

has no such leave abuse, drug or other arrest record, or substance abuse.

Unlike Ms. Sutton, the Plaintiff has never provided false information to any government

authority.    Ms. Sutton's real age is uncertain.  She gave the name of her daughter,

Jherron Sutton, upon her arrest.     She stated her date of birth differently in her Maryland

Criminal Court case records as well as providing different social security numbers.

Despite creditors having tracked down Ms. Sutton down at DOE Headquarters to garner

her federal salary, she has been promoted rather than fired in EIA.

One of Ms. Sutton's aliases is "Jherron von Sutton."   Ms. Sutton currently does training

for Mr. Durbin.  Ms. Sutton tested positive for substance abuse during her probation after

she was allowed to return to daily employment in 2002 after pro-longed leave abuse.

The plaintiff is informed and believes that Mr. Durbin has violated national security by

allowing Ms. Sutton to continue drug abuse while employed in a top-secret security

agency that stockpiles nuclear weapons.  As the Director of budget and personnel

resources for EIA, Mr. Durbin has moved Ms. Sutton to the National Energy Information

Center (NEIA) in EIA with the transferred GS-13 duties of Congressional Liaison,

FOIA/Privacy Act and Federal Managers Financial Integrity Act (FMFIA) of Ms.

Dorothy Pritchett.

### Continued Intentional discrimination and Disparate Treatment

Mr. Durbin did not rate Ms. Sutton and Ms. Maples below marginal when they returned to work after November 19, 2001, as he had Plaintiff rated below marginal as the reviewing official.

Neither female was ever placed on Performance Improvement Plans. Plaintiff was treated differently because of her prior EEO activity and reports to the Office of Security. Both females are Black Americans. *Plaintiff's rebuttal to the removal is availa*ble. Mr. Mark Friedman a Caucasian male was also allowed to return to work in EIA on November 19, 2001, after being removed. However, Ms. Hutzler did not allow Mr. Friedman to return to his former office. He was reassigned to a less hostile office.

Ms. Hutzler refused to afford Plaintiff a reassignment to a less hostile office. Plaintiff believes that Mr. Friedman was a GS-14 and a bargaining unit member. Mr. Durbin and Mr. Fordham denied Plaintiff bargain unit membership upon joining EIA so as to deny her negotiated grievance procedures under the National Treasury Employees Union DOE Headquarters Collective Bargaining Agreement and availability to invoke *Weingarten* rights.

Ms. Maples Lewis used her agency contracts credit cards twice for personal purchases; this theft of Federal funds was not prosecuted and she was not fired. Ms. Maples informed Plaintiff she did not want to be involved in her EEOC Hearing, and is employed at the Department of Transportation.

**Continued Harassment in the work place after November 19, 2001.**

The Plaintiff continued to be subjected to an ongoing hostile environment, harassment and intimidation while on the Performance Improvement Plan (PIP) by Ms. Hall. Plaintiff was given letters, and electronic mail messages of counseling, conduct, and warnings through Ms. Velma Washington and Ms. Davenia Harris. During the PIP, Plaintiff attended meetings, asked questions and completed the PIP work as ordered and provided it to Ms. Hall. Plaintiff asked for Training briefings, and updates of events since Plaintiff's name was removed from the Training Coordinator's email listing by Ms. Hall. Plaintiff was denied agency training information, news and knowledge of events and general information from Headquarters training, done intentionally Ms. Hall.

Plaintiff had been placed on forced leave for six and one-half months and was denied briefings by Mr. Durbin and Ms. Hall. Plaintiff's requests for needed access to information and training fell on deaf ears, in the completion of the PIP.

Further, Ms. Hall ordered the Plaintiff not to talk with anyone in Departmental Training, such as agency Headquarters Coordinators in training, departmental Training Coordinators, and anyone in general about training entities. "Only talk to me about training," Ms. Hall said to Plaintiff.

Ms. Hall ordered Mr. Santos not to help the Plaintiff with computer questions about the system, or if the system malfunctioned, and questioned his talking to Plaintiff. Mr. Santos was so terrified of Ms. Hall he asked the Plaintiff not to come into his office because he would get in trouble with Ms. Hall.

20

Mr. Santos was not the EIA computer repair individual. But many in the office went to him with questions, and sought his help as a Computer Science major completing his degree as a student intern.

## Mr. Fordham's Bias Labor Relations Actions

The Plaintiff often observed Mr. Fordham in the office of Mr. Durbin and Ms. Hall, and Plaintiff asked him a question; Mr. Fordham informed Plaintiff that he worked for management.  Mr. Fordham worked for Labor Relations at the U. S. Department of Energy and was biased in his effort regarding Plaintiff.  Around April 18, or 19, 2001, in a meeting in Labor Relations called by Ms. Sandra Vincent and Mr. Fordham,  Plaintiff was informed by  Mr. Fordham  if she would stop filing so many EEO cases, things may not be so bad for her.  He further said, "How are you going to pay her legal bills when Steve [Mr. Durbin], puts you on the street?"

Ms. Vincent testified at the EEOC Hearing but Mr. Fordham did not.  Mr. Fordham was deposed on July 12, 2002, in Rockville, Maryland in which he stated that Plaintiff was the only person that the EIA had placed on a Performance Improvement Plan and fired.

The other person treated similarly Mr. Paul Turpin, who retired or resigned before he was terminated.  Mr. Fordham also said he had never seen any of Plaintiff's completed work from the EIA that he relied on Ms. Hall's word.

21

Mr. Fordham admitted that he was responsible for some of the wording in Plaintiff's letters and memoranda that adversely led to Plaintiff's calculated firing. Plaintiff believes that Mr. Durbin gave Mr. Fordham monetary awards for his efforts in the plan to fire her. Mr. Fordham refused to provide Plaintiff a neutral party to review her completed work in the Performance Improvement Plan. Plaintiff did not have the authority to do this, and Mr. Fordham refused, as well as his supervisor. Mr. Fordham took the initiative to halt Plaintiff's three GS-15 representatives from attending meetings after November 19, 2001.

Plaintiff is informed and believes that Mr. Fordham threatened to send letter to the three representative's supervisors. Plaintiff had worked at the U. S. Department of Energy for sixteen years, and was a member of Blacks in Government. One representative, Mr. Charles Washington, testified for Plaintiff at the Hearing and helped her with the Performance Improvement Plan assignments.

The Congressional Black Caucus was notified, and there was a meeting with the Blacks in Government elected officers with an Assistant Secretary, at the U. S. Department of Energy. Plaintiff notified her Congressman of the way she was adversely treated at the U. S. Department of Energy.

Mr. Durbin wanted Plaintiff fired before May 3, 2002, but Mr. Fordham wrote in an e-mail, that due process required a certain number of days to contrive such an adverse action. Mr. Durbin denied Plaintiff an oral and written rebuttal to the removal.

## Denial of Training in retaliation for EEO Activity

Mr. Durbin and Ms. Hall denied Plaintiff training for two consecutive years in denying her an Individual Development Plan. At the EEOC Hearing, Ms. Hall testified that Plaintiff's training was on the wrong Individual Development Plan. If this statement is factual, then Ms. Hall, Plaintiff's Team Leader, failed to provide Plaintiff with a copy of the Individual Development Plan, for two consecutive years. Ms. Hall's supervisory authority was removed after she sexually harassed a male student intern, Mr. Joseph Santos.

Plaintiff is informed and believes that Ms. Hall was arrested in Virginia, her home state, for driving while intoxicated. However, Mr. Durbin treated Ms. Hall disparately with annual cash awards for being his hatchet person against those with Blacks with EEO activity with no criminal activity. This disparate impact included not only the Plaintiff, but Ms. Dorothy Pritchett and Mr. Joseph Santos, who each had prior EEO activity.

Ms. Hall was allowed to retire and was not fired when she provided three conflicting versions of sworn testimony regarding her $150 proffer of cash to Mr. Santos, i.e. (1) is was a "gift," (2) the bribe in violation of 18 U.S.C. 209 never happened, and (3) it was a "loan."

## Diversity Manager and Federal Allocations

Ms. Hall was hired as the "Diversity Manager," and had a budget of $100,000.00 from the date of her hiring around 1997 to around 2000. The Plaintiff is informed and believes

the federal funds were for historically black colleges and university programs and tuition. These funds were not expended for this purpose for several years.

In EIA around 2001 the amount was reduced to $80,000.00, for historically black colleges and universities, by Mr. Daniel Wormer of the EIA Budget office for non-use by Ms. Hall. The remainder $20,000.00 was listed for the Hispanic College Program. The Plaintiff is informed and believes that these federal unexpended funds may be the slush fund Mr. Durbin has accumulated over the years, spending willfully and personally, for service of Gordon Rollins and others.

## Mr. Durbin rates a GS-14 Team Leader with all Zeroes

Mr. Durbin rated all the annual performance rating factors Ms. Georgia (Dolly) Collier with zeros for each performance element of her rating plan when she refused to rate the annual performance of Mr. Leo Conrad, III as below marginal, as he instructed her to do. Ms. Hall had no problem in following Mr. Durbin's orders to rate Plaintiff below marginal. Ms. Collier suffered a heart attack and retired from ORM's Contracts Team. Ms. Collier, a Native American Indian was over the age of 50, at the time of her disparate treatment as a minority. This disparate impact against minorities in EIA occurred prior to Plaintiff being fired by Mr. Durbin.

When Mr. Conrad testified for Plaintiff at the EEOC Hearing, in retaliation Mr. Durbin rated him low in his yearly performance appraisal. In retaliation for her testimony, Mr. Durbin has refused to detail and reassign Ms. Dorothy Pritchett from his supervision.

Moreover, Ms Pritchett has informed Plaintiff that she was denied a promotion to the GS-14 level by Mr. Durbin for her protected EEO activity.   Mr. Durbin also refused her training for her newly assigned duties in Human Resources despite EEO settlement agreements requiring adequate training.

When Plaintiff worked in the EIA Mr. Durbin and Ms. Hall denied the training for Ms. Pritchett, Mr. Santos and Plaintiff in retaliation for their protected EEO activity had their annual performance ratings lowered arbitrarily.   When Ms. Collier approved the training for her subordinate Mr. Lenny Conrad, her annual performance rating may have also suffered.

## Work place Harassments Escalates

In February 2001, Ms. Hall snatched a performance rating out of Plaintiff's hand as she wrote a sentence on the form.  On March 8, 2001, Mr. Durbin lunged at Plaintiff in another closed-door meeting after Plaintiff's tour of duty was over for the day.  This hostile and combative meeting was very unsettling.  Mr. Durbin told Plaintiff "you need to take a good look at yourself in the mirror!"  He proceeded to give Plaintiff an assignment to test her analytical capabilities, and write how Plaintiff analyzed her work. Mr. Durbin said it would serve to determine if Plaintiff needed training.

Mr. Durbin and his immediate subordinate Ms. Hall treated no one else on the staff without EEO activity adversely.  The Plaintiff was terrorized at work to the point she became ill, with threats to rate her annual performance low and berating her completed

work without cause. When there were no problems or mistakes, the Plaintiff was still denied training and given extra make work. During the EEOC Hearing no evidence was presented to prove and any errors or mistakes in Plaintiff's work as the Training Program Specialist for EIA. There was no credible corroboration by either Ms. Hall or Mr. Durbin that any performance element was lacking to place the Plaintiff on a PIP, or let alone fire her for the "efficiency of the service."

Plaintiff prepared Ms. Hall's Diversity Report for her. Ms. Hall took the credit for her annual "outstanding" cash bonuses. The disability and retirement eligibility report was accurately completed by the Plaintiff without any corrective input or help from Ms. Hall. Neither Ms. Hall nor Mr. Durbin took into consideration the mandatory DOE requirement that the Plaintiff's contribution to the mission of the ORM/EIA be taken into consideration in an annual performance rating.

Plaintiff was physically compelled to go to the DOE Headquarters Health Unit when her heart rate and blood pressure became dangerously high. Both Mr. Durbin and Ms. Hall failed to provide reasonable accommodation under the Americans with Disabilities Act.

The Plaintiff was compelled to answer hostile questions that only made the Kangaroo Court style interrogations harsher and more abusive. At the March 8, 2001, closed door meeting, Mr. Durbin accused Plaintiff of calling Ms. Hall a liar.

In order to provoke the Plaintiff to an outburst that could constitute insubordinate or disrespectful behavior, Mr. Durbin falsely impugned the Plaintiff with the defamatory appellation of "liar" regarding falsehoods contrived in the imagination of Ms. Hall.

Mr. Durbin questioned Plaintiff in an extremely hostile and angry manner with, "Are you saying miss Hall is a liar! Are you?! Is that what you are saying!" Plaintiff responded by saying to Mr. Durbin that Ms Hall is not telling you the truth. "Then you are calling her a liar," Mr. Durbin said. The Plaintiff asked numerous times for the door to be opened, and Mr. Durbin refused. Plaintiff believes that Mr. Durbin and Ms. Hall could say whatever they wanted to her behind closed doors and later deny the statement. Ms. Hall and Mr. Durbin could then falsely cover for each other regarding what was actually said.

That is why Plaintiff asked for a representative of her choice to attend the hostile and terrorizing meetings she was forced to attend with Mr. Durbin and Ms. Hall. Plaintiff's requests were denied each time.

On April 26, 2001, as Plaintiff sat working at her desk Mr. Durbin rushed into her office, and stood over her, Ms. Hall was blocking the door. Mr. Durbin informed Plaintiff that he was placing her on forced sick leave for an indefinite period of time, and until she got "well."

Mr. Durbin stood so close to Plaintiff as to violate her personal space. Had Plaintiff moved her head slightly it would have collided with Mr. Durbin below his belt. Mr. Durbin's foot was placed between the legs of Plaintiff's chair so as to make her immobile. Mr. Durbin continued to stand over Plaintiff who thought she was having a heart attack and dialed the operator. The Plaintiff wanted her doctor; the ambulance, and paramedics were on their way. The dispatcher said she was going to hang up the phone when Plaintiff asked her not to, Mr. Durbin was still standing over the Plaintiff and she was frightened. When the dispatcher asked whether he been standing over you all this time, Plaintiff answered yes. Do you want the police? The dispatcher asked. Plaintiff responded in the affirmative. Mr. Durbin did not leave Plaintiff's side until an agency security guard called him out of her office.

Mr. Durbin soon returned, and since Plaintiff's office door was partially closed, Mr. Durbin glared through at the Plaintiff. Mr. Durbin he had something in his hand and then he took his foot and kicked Plaintiff's office door open.

The Plaintiff sat frozen as she was too terrified to move. Mr. Durbin continued to stand and glare at Plaintiff until once, more a security guard call Mr. Durbin away from Plaintiff's office. The Plaintiff never moved from the chair for fear she would faint and Mr. Durbin would kick her like he did the door. The Plaintiff was taken to the hospital by ambulance.

## **Stalking an Incumbent at home and in the Workplace**

During the week of November 19, 2001, Mr. Durbin harassed Plaintiff because of sex and violated her space intentionally. The Plaintiff was ordered by Mr. Durbin to read the letter ordering her to return to work on November 19, 2001. Mr. Durbin claims he wanted to discuss it with Plaintiff.

Mr. Durbin approached Plaintiff, backed her up in her cubicle, outside his office, in which Ms. Hall had ordered her to sit. Mr. Durbin proceeded to question Plaintiff, regarding her reading the 16-page document. Plaintiff, replied no, she took a break and went to the ladies room. Mr. Durbin accused her of not going to the ladies room when he said, I saw you... I followed you! Plaintiff reiterated to Mr. Durbin that she indeed had gone to the ladies room, on another floor.

A short time later Mr. Durbin returned to Plaintiff's small cubicle, and violated her space and proceeded to accused her of not being home to receive the letter on Saturday, November 17, 2001. "You were not home were you?" Mr. Durbin quizzed Plaintiff, in hostile tones. "No!," he said, "You were not home, were you!" The Plaintiff remembered her car was not in the usual space and that Mr. Durbin must have been in her neighborhood to shout that emotional accusation. In fact the Plaintiff's car was in the shop and Plaintiff was at home. Plaintiff also learned that the courier does not deliver on Saturday. These two harassing incidents were reported by hand delivery to the Head of Security at the U. S. Department of Energy. To date, no response has been given to the Plaintiff. The Plaintiff requests a trial by Jury for the damages listed below. *Plaintiff's*

*reports to U. S. Department of Energy Security are available. Plaintiff's EEOC Reports of Investigation are Available. Plaintiff's rebuttal to her removal is available. Plaintiff's prior work and weekly reports and e-mails, letters and memorandums are available.*

### Damages

As a result of the aforementioned conduct, Plaintiff has suffered a loss of her job, promotion(s), wages, and benefits, suffering severe stress, anxiety, emotional pain and anguish, humiliation, and embarrassment and under the care of a cardiologists, and other non-pecuniary losses, all of which has had a negative overall impact on her mental health, her economic and employability in the federal and state governments and the private sector. Plaintiff suffers and continues to suffer from headaches, depression and other psychological symptoms that created tension and unhappiness as well as a loss of enjoyment in her personal and family life. Defendant's discriminatory treatment has also caused Plaintiff to experience irregular heart and pulse rate, sleeplessness and fatigue.

Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged, and is now suffering, and will continue to suffer irreparable injury from. Defendant's intentional treatment. .

### COUNT ONE

### Radial Discrimination in Violation of Title VII of the Civil Rights Act of 1964 as amended and the Civil Rights Act of 1992

Plaintiff repeats and reiterates each and every allegation in this Complaint as is specifically alleged herein.

Through the above-described acts and conduct, Defendant(s) has discriminated against Plaintiff on the basis of her race by denying her promotional opportunities,

30

placing her on forced leave, threatened her federal career because of her protected EEO activity, harassed her because of her sex, placed her on a Performance Improvement Plan and fired her in retaliation and in violation of Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991.

Defendant engaged in the above-described discriminatory acts and conduct against Plaintiff with malice and/or reckless indifference toward Plaintiff's rights under Title VII of the Civil rights Act of 1964, as amended and the Civil Rights Act of 1991; The Equal Pay Act of 1963, Section 206; and the Age Discrimination in Employment Act of 1967, Section 621, Section 622 Section and Section 623.

WHEREFORE, The Plaintiff prays that this Court:

a.  Declare Defendants' conduct, and each of them, to violate Plaintiff's civil rights;

b.  Restore Plaintiff's federal employment and enjoin Defendant from imposing a hostile environment among Blacks, aged 40 to 70, with prior EEO activity,

c.  Award Plaintiff lost wages, promotion benefits, and reinstatement;

d.  Award Plaintiff appropriate compensatory damages;

e.  Award Plaintiff her costs and reasonable attorneys' fees; and

f.  Award Plaintiff such other and future relief as may be deemed just and proper.

## COUNT TWO

### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964 as amended and the Civil Rights Act of 1991.

Plaintiff repeats and reiterates each and every allegation of paragraphs of this Complaint as is specifically alleged herein.

Plaintiff repeats and reiterates each and every allegation in this Complaint as is specifically alleged herein.

Through the above-described acts and conduct, Defendant(s) has discriminated against Plaintiff on the basis of her race by denying her promotional opportunities, placing her on forced leave, threatened her federal career because of her protected EEO activity, harassed her because of her sex, placed her on a Performance Improvement Plan and fired her in violation of Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991.

Defendant engaged in the above –described discretionary acts and conduct against Plaintiff with malice and/or reckless indifference toward Plaintiff's rights under Title VII of the Civil rights Act of 1964, as amended and the Civil Rights Act of 1991; The Equal Pay Act of 1963, Section 206; and the Age Discrimination in Employment Act of 1967, Sec. 621, Section 622 Section and Section 623.

WHEREFORE, Plaintiff prays that this Court:

a.  Declare Defendant's conduct to be in violation of Plaintiff's civil rights;

b.  Enjoin Defendant from engaging in such conduct as harassment because of her Protected EEO activity, her sex, race, national origin and color.

c.  Award Plaintiff lost wages, promotion(s) benefits and reinstatement.

d.  Award Plaintiff appropriate compensatory damages;

e.  Award Plaintiff her costs and attorneys' fees; and

f.  Award Plaintiff such other and future relief as may be deemed just and proper.

32

## **COUNT THREE**

### **Racial Discrimination in Violation of Title VII of the Civil Rights Ave of 1964 as amended and the Civil Rights Act of 1991.**

Plaintiff repeats and reiterates each and every allegation of paragraphs of this Complaint as is specifically alleged herein.

Through the above-described acts and conduct, Defendant(s) has discriminated against Plaintiff on the basis of her race by denying her promotional opportunities, placing her on forced leave, threatened her federal career because of her protected EEO activity, harassed her because of her sex, placed her on a Performance Improvement Plan and fired her in violation of Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991.

Defendant engaged in the above –described discriminary acts and conduct against Plaintiff with malice and/or reckless indifference toward Plaintiff's rights under Title VII of the Civil rights Act of 1964, as amended and the Civil Rights Act of 1991; The Equal Pay Act of 1963, Section 206; and the Age Discrimination in Employment Act of 1967, Sec. 621, Section 622 Section and Sec 623.

WHEREFORE, Plaintiff prays that this Court:

a.    Declare Defendants' conduct to be in violation of Plaintiff's civil rights;

b.    Enjoin Defendant from engaging in such conduct as harassment because of her Protected EEO activity, her sex, race, national origin and color.

c.    Award Plaintiff lost wages, promotion(s) benefits and reinstatement;

d.    Award Plaintiff appropriate compensatory damages;

e.    Award Plaintiff her costs and attorneys' fees; and

f.    Award Plaintiff such other and future relief as may be deemed just and proper.

Respectfully submitted,

*Carolyn E. Williams*

Carolyn E. Williams
8931 Town Center Circle
Unit 308
Upper Marlboro, MD 20774
301-499-2935

Attachment 1; Letter and attachments to Ms Hutzler of October 3, 2001